FILED
APR 2 3 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

CASE UNSEALED
4/25/14

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Magistrate Case No. '14MJ1494 |
| | ) | |
| v. | ) | COMPLAINT FOR VIOLATION |
| | ) | OF: |
| RANDY ALTON GRAVES (1), | ) | |
| aka "Sweets", | ) | |
| DARNELL JAMES BUTLER (2), | ) | Title 18, U.S.C., Sec. |
| aka "BK Butler", | ) | 1962(d) - Conspiracy to |
| DAMEON DESEAN SHELTON (3), | ) | Conduct Enterprise |
| aka "Shotgun", aka "Gun", | ) | Affairs Through A Pattern |
| LEON FRANKLIN (4), | ) | of Racketeering Activity |
| aka "Stone", | ) | |
| BRANDON LAMAR WHITTLE (5), | ) | |
| aka "Slim", | ) | |
| ANDRE LAMAR HARRISON (6), | ) | |
| CLEOTHA YOUNG (7), | ) | |
| aka "Stinker", | ) | |
| SHAROD LEVALE JACKSON (8), | ) | |
| aka "Bopper", | ) | |
| TERRY CARRY HOLLINS (9), | ) | |
| aka "Caby", aka "Caby-3", | ) | |
| aka "3", | ) | |
| JERMAINE GERALD COOK (10), | ) | |
| aka "Tre-O", | ) | |
| DONALD EUGENE BANDY (11), | ) | |
| aka "DC", | ) | |
| MARCUS ANTHONY FOREMAN (12), | ) | |
| aka "Missle", | ) | |
| WILBERT ROSS (13), | ) | |
| aka "Coy Blue", aka "Coy", | ) | |
| BRENDA LIANA RODRIGUEZ (14), | ) | |
| aka "Dollar", | ) | |
| GAQUAYLA AUNICIA LAGRONE (15), | ) | |
| aka "China", | ) | |
| SOLCAMIRE CASTRO-HERNANDEZ (16), | ) | |
| aka "Jenny Dash", | ) | |
| LUIS SALGADO-VISCARRA (17), | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The undersigned complainant being duly sworn states:

**THE ENTERPRISE**

1. At various times material to this complaint, Defendants RANDY ALTON GRAVES (1) aka "Sweets"; DARNELL JAMES BUTLER (2), aka "BK Butler"; DAMEON DESEAN SHELTON (3), aka "Shotgun", aka "Gun"; LEON FRANKLIN (4), aka "Stone"; BRANDON LAMAR WHITTLE (5), aka "Slim"; ANDRE LAMAR HARRISON (6); CLEOTHA YOUNG (7), aka "Stinker"; SHAROD LEVALE JACKSON (8), aka "Bopper"; TERRY CARRY HOLLINS (9), aka "Caby", aka "Caby-3", aka "3"; JERMAINE GERALD COOK (10), aka "Tre-O"; DONALD EUGENE BANDY (11), aka "DC"; MARCUS ANTHONY FOREMAN (12), aka "Missle"; WILBERT ROSS (13), aka "Coy Blue", aka "Coy"; BRENDA LIANA RODRIGUEZ (14), aka "Dollar"; GAQUAYLA AUNICIA LAGRONE (15), aka "China"; SOLCAMIRE CASTRO-HERNANDEZ (16), aka "Jenny Dash"; LUIS SALGADO-VISCARRA (17) (collectively "Defendants"), and others known and unknown, were members, associates and facilitators of an organization known as the West Coast Crips ("WCC").

2. The WCC organization is engaged in a variety of illegal activities, including but not limited to narcotics trafficking, murder, conspiracy to commit murder, attempted murder, illegal prostitution, and sex trafficking of children. At all relevant times, the WCC operated in the Southern District of California and elsewhere. The WCC, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18,

United States Code, Section 1961(4) (hereinafter the "Enterprise"), that is, a group of individuals associated in fact. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

**THE RACKETEERING CONSPIRACY**

3. Beginning in or about late 2012, and continuing up to and including April 24, 2014, within the Southern District of California and elsewhere, defendants RANDY ALTON GRAVES (1) aka "Sweets"; DARNELL JAMES BUTLER (2), aka "BK Butler"; DAMEON DESEAN SHELTON (3), aka "Shotgun", aka "Gun"; LEON FRANKLIN (4), aka "Stone"; BRANDON LAMAR WHITTLE (5), aka "Slim"; ANDRE LAMAR HARRISON (6); CLEOTHA YOUNG (7), aka "Stinker"; SHAROD LEVALE JACKSON (8), aka "Bopper"; TERRY CARRY HOLLINS (9), aka "Caby", aka "Caby-3", aka "3"; JERMAINE GERALD COOK (10), aka "Tre-O"; DONALD EUGENE BANDY (11), aka "DC"; MARCUS ANTHONY FOREMAN (12), aka "Missle"; WILBERT ROSS (13), aka "Coy Blue", aka "Coy"; BRENDA LIANA RODRIGUEZ (14), aka "Dollar;" GAQUAYLA AUNICIA LAGRONE (15), aka "China"; SOLCAMIRE CASTRO-HERNANDEZ (16), aka "Jenny Dash"; LUIS SALGADO-VISCARRA (17) (collectively "Defendants"), and others known and unknown to the grand jury, being persons employed and associated with the Enterprise (as defined above), which Enterprise was engaged in, and

the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with other persons, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity involving multiple acts chargeable under the following provisions under California state law and federal law, and which are punishable by imprisonment for more than one year:

a. Acts and threats involving murder in violation of California Penal Code, Sections 182, 187, 422, 653f(b) and 664;

b. Acts involving robbery in violation of California Penal Code, Sections 182, 211, 212.5, 635f, 664;

and multiple acts indictable under the following provisions of federal law:

c. Title 18, United States Code, Section 1956 (money laundering);

d. Title 18, United States Code, Section 1957 (conspiracy to launder money);

e. Title 18, United States Code, Section 2421 (Mann Act);

and multiple acts involving distribution of narcotics in violation of:

f. Title 21, United States Code, Section 841(a) (distribution of controlled substances);

g. Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances);

h. Title 21, United States Code, Section 952 (importation of controlled substances);

i. Title 21, United States Code, Section 963 (conspiracy to import controlled substances).

4. It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

In violation of Title 18, United States Code, Section 1962(d).

//

//

//

//

//

//

And the complainant states that this complaint is based on the attached Affidavit, which is incorporated herein by reference.

Katie Harding, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence in San Diego, California this 22d day of April, 2014.

HON. NITA L. STORMES
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Special Agent Katie Harding, being duly sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent of the United States Federal Bureau of Investigation ("FBI") and an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since June 2004. I am currently assigned to the San Diego Field Division working as a member of the San Diego East County Regional Gang Task Force in El Cajon, California. My duties include the investigation and apprehension of individuals involved in violent gang-related activities as well as drug trafficking and distribution. Prior to joining the FBI, I was employed as a Forensic Scientist with the Oregon State Police. In that position, I processed crime scenes and examined evidence. I have received sixteen (16) weeks of training at the FBI Academy in Quantico, Virginia. During that training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Through my employment as a Special Agent with the FBI, I have become familiar

with, and have participated in all the traditional methods of narcotics investigations, including, but not limited to: visual surveillance, questioning of witnesses, the use of search warrants, handling of informants and cooperating witnesses, pen registers, monitoring Title-III interceptions, and undercover operations. As a FBI Special Agent, I have participated in over 100 arrests for narcotics-related and gang-related offenses. I have participated in over 20 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, and the interview of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out their violent crime and drug trafficking activities. As a FBI Special Agent, I have participated in several investigations into San Diego-area Hispanic street gangs and the Mexican Mafia. I was the co-case agent on two investigations in particular that led to the arrest and prosecution of nearly 100 Mexican Mafia members, associates, and soldiers. These investigations led to numerous charges being filed, including racketeering (with predicate acts of murder, attempted murder, and robbery), extortion, drug trafficking, and various firearms offenses. We employed a variety of

investigative techniques in these investigations, including Title-III interceptions of wire communications, consensual monitoring of communications, undercover operations, and confidential informants. I have also interviewed several made Mexican Mafia members, and dozens of associates and soldiers. Through the course of these investigations, I have gained substantial knowledge of the Mexican Mafia and Hispanic street gangs as well as the investigative techniques necessary to investigate them successfully.

3. As a Special Agent, I have performed various tasks which include, but are not limited to:

a. Functioning as a surveillance agent and thereby observing and recording movements of persons, including gang members, trafficking in illegal drugs and weapons, and those suspected of trafficking in illegal drugs and weapons;

b. Tracing monies and assets gained by drug traffickers, including gang members, from the illegal sale of drugs and weapons (laundering of monetary instruments);

c. Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary

instruments); and

d. Supervising, as a case agent/co-case agent, specific investigations involving the trafficking of drugs and laundering of monetary instruments.

**BASIS FOR CONCLUSIONS AND SOURCES OF INFORMATION**

4. My training and experience as a Special Agent of the FBI, and my conversations with other senior FBI Special Agents, Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives, Drug Enforcement Administration, and Immigration and Customs Enforcement, Detectives from the San Diego County Sheriff's Department, Investigators from the San Diego County District Attorney's Office, Officers from the San Diego County Probation Department; and Specialists and Investigators from the California Department of Corrections and Rehabilitation, and numerous other investigators familiar with violent crime, narcotics trafficking, gang activity, and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

5. I make this affidavit, in part, based on my personal knowledge derived from my participation in this investigation and, in part, based upon information from the following sources:

a. Oral and written reports about this investigation which I have reviewed;

b. Physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly;

c. A review of pen registers and telephone airtime and call records;

d. Summaries of conversations and electronic communication intercepted pursuant to court-authorized electronic surveillance orders;

e. A review of consensually recorded conversations; and

f. Statements of cooperating individuals.

6. Except as otherwise noted, the information set forth in this affidavit has been provided to me by FBI agents, multi-agency federal, state, and local drug/gang task force officers. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by other law enforcement officers (who may have had either direct or hearsay knowledge of the statement) or whom I have spoken or whose report I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations, but rather has been provided to me directly or indirectly by other law enforcement officer who conducted surveillance. In this affidavit I have also included, where appropriate, my interpretation of intercepted telephone calls in parenthesis or brackets. Those interpretations are based upon my

training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

7. Because this affidavit is being submitted for the limited purpose of seeking the arrest and search warrants specified below, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

## FORMAT OF THIS AFFIDAVIT

8. I submit this affidavit for a dual purpose: (1) the issuance of arrest warrants based upon a criminal complaint alleging a conspiracy to conduct enterprise affairs through a pattern of racketeering activity, a violation of Title 18, United States Code, Section 1962(d) (hereinafter "RICO conspiracy"); and (2) the issuance of search warrants for the locations specified below.

9. In furtherance of that dual purpose, I have divided this affidavit into six sections. First, in the section captioned "Requested Arrest Warrants," I set forth the names and other identifying information regarding the individuals for whom I am seeking arrest warrants (collectively referred to as the "Target Subjects"). Second, in the section captioned "Requested Search Warrants," I list the addresses of the

properties for which I am requesting search warrants. Third, in the section captioned "Probable Cause," I set forth those facts and circumstances which I believe establish the probable cause necessary for the Court to issue the requested criminal complaint, arrest warrants, and search warrants. Fourth, in the section captioned "Target Subjects – Summary of Probable Cause," I provide the Court with a brief summary of each Target Subject's involvement in the RICO conspiracy. Fifth, in the section captioned "Search Location Summary," I set forth a summary of the facts and circumstances which I believe establish the probable cause necessary for the Court to issue the requested search warrants. Finally, in the section captioned "Items To Be Seized," I set forth the basis for seizing the items requested in the search warrant applications.

**REQUESTED ARREST WARRANTS**

10. I respectfully submit that the facts set forth in this affidavit demonstrate that there is probable cause to believe that the Target Subjects knowingly and intentionally participated in a RICO conspiracy, a violation of Title 18, United States Code, Section 1962(d). The Target Subjects are identified as follows:

a. Randy Alton GRAVES, aka "Sweets," has been identified as a Black male, DOB 07/08/1963, 6'00" in height, 205 pounds, and currently resides at 655 Sandalwood Drive, El Cajon, California, 92021.

b. Darnell James BUTLER, aka "BK Butler," has been identified as a Black male, DOB 12/02/1986, 5'11" in height, 217 pounds, and is currently in state custody in the Southern District of California.

c. Dameon Desean SHELTON, aka "Shotgun," aka "Gun," has been identified as a Black male, DOB 01/18/1974, 6'00" in height, 180 pounds, and currently resides at an unknown location.

d. Leon FRANKLIN, aka "Stone," has been identified as a Black male, DOB 10/31/1975, 5'7" in height, 187 pounds, and currently resides at 515 13th Street #213, San Diego, California, 92154.

e. Brandon Lamar WHITTLE, aka "Slim," has been identified as a Black male, DOB 02/27/1990, 6'3" in height, 187 pounds, and currently resides at 3356 B Street, San Diego, California, 92102.

f. Andre Lamar HARRISON has been identified as a Black male, DOB 12/21/1969, 5'10" in height, 165 pounds, and currently resides at an unknown location.

g. Cleotha YOUNG, aka "Stinker," has been identified as a Black male, DOB 07/11/1978, 6'2" in height, 180 pounds, and currently resides at 2225 Saipan Drive #8, San Diego, California, 92139.

h. Sharod Levale JACKSON, aka "Bopper," has been identified as a

Black male, DOB 12/13/1967, 6'00" in height, 235 pounds, and currently resides at 811 S. 32nd Street, San Diego, California, 92113.

i. Terry Carry HOLLINS, aka "Caby," aka "Caby-3," aka "3," has been identified as a Black male, DOB 08/29/1982, 5'10" in height, 225 pounds, and is currently in state custody in the Southern District of California following a pre-trial release violation.

j. Jermaine Gerald COOK, aka "Tre-O," has been identified as a Black male, DOB 12/06/1984, 6'00' in height, 215 pounds, and is currently in state custody in the Southern District of California for a probation violation.

k. Donald Eugene BANDY, aka "DC," has been identified as a Black male, DOB 06/08/1988, 5'11" in height, 170 pounds, and currently resides at the Parkside Inn, 1267 11th Avenue, San Diego, California, 92101.

l. Marcus Anthony FOREMAN, aka "Missle," has been identified as a Black male, DOB 12/05/1987, 6'00" in height, 180 pounds, and is currently in state custody in the Southern District of California for a parole violation.

m. Wilbert ROSS, aka "Coy Blue", aka "Coy," has been identified as a Black male, DOB 08/26/1983, 6'00" in height, 190 pounds, and is currently in state custody in the Southern District of California.

n. Brenda Liana RODRIGUEZ, aka "Dollar," has been identified as a

White/Hispanic female, DOB 04/22/1988, 5'2" in height, 169 pounds, and currently resides at the Parkside Inn, 1267 11th Avenue, San Diego, California, 92101.

o. Gaquayla Aunicia LAGRONE, aka "China," has been identified as a Black female, DOB 09/20/1983, 5'8" in height, 175 pounds, and currently resides at the Howard Johnson Inn, 6440 El Cajon Boulevard #212, San Diego, California, 92115.

p. Solcamire CASTRO-HERNANDEZ, aka "Jenny Dash," has been identified as a Hispanic female, DOB 08/02/1986, 5'7" in height, 130 pounds, and currently resides at 8087 Shady Sands Road, San Diego, California, 92119.

q. Luis SALGADO-VISCARRA, has been identified as a Hispanic male, DOB 01/22/1964, 5'6" in height, 170 pounds, and currently resides at 10767 Jamacha Boulevard #10, Spring Valley, California, 91978.

**REQUESTED SEARCH WARRANTS**

11. I also respectfully submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that one or more of the following will be found at the search locations described below: contraband; person(s) to be arrested; property designed for use, intended use, or used in committing a crime; and/or fruits, instrumentalities and evidence of a violation of

Title 18, United States Code, Section 1962(d).

a. The location described as 655 Sandalwood Drive, El Cajon, California, 92021 ("**Target Location #1**");

b. The location described as 8087 Shady Sands Road, San Diego, California, 92119 ("**Target Location #2**");

c. The location described as 515 13th Street #213, San Diego, California, 92154 ("**Target Location #3**");

d. The location described as 811 S. 32nd Street, San Diego, California, 92113 ("**Target Location #4**");

e. The location described as 4582 and 4584 Federal Boulevard, San Diego, California, 92105 ("**Target Location #5**");

f. The location described as 10767 Jamacha Boulevard #10, Spring Valley, California, 91978 ("**Target Location #6**").

## PROBABLE CAUSE

### A. Introduction

12. The West Coast Crips ("WCC") is a street gang with a historical base of operations in the neighborhood of Logan Heights in San Diego, California, and current operations throughout the greater San Diego area. The WCC has existed for

over thirty years and claims several hundred members.[1]

13. The WCC claims territory with borders roughly defined by Interstate 94 to the north, National Avenue to the south, Interstate 5 on the west, and Interstate 15 on the east. This territorial homeland shows up in various symbols such as "20's" or "30's" referencing historic ties to San Diego neighborhoods between 20th Street and 40th Street. The WCC has a recognizable name, hand signs, tattoos, language, and colors, which members employ to signify their allegiance to the gang.

14. Membership in the WCC can be acquired in various ways. Some members claim family connections. Some members were inducted through acts of violence. All WCC members are expected to put in "work," that is, commit a criminal act, for the gang when called upon.

15. The WCC is comprised of several sub-sets or "cliques," of smaller groups of gang members that recognize their common ties to the WCC Enterprise but also maintain a distinct identity within the larger organization. The "3-Babiez" are one

---

1 This summary of the WCC is based upon, among other things, my personal review of intercepted conversations involving the Target Subjects. Indeed, during the course of this investigation, law enforcement officers conducted court-authorized wiretaps on nineteen different telephone facilities used by the Target Subjects. The wiretaps on those telephones resulted in the seizure of over 73,000 conversations.

To date, agents have seized approximately 20 firearms, over 4 1/2 pounds of methamphetamine, approximately two ounces of crack cocaine, approximately one kilogram of powder cocaine, and approximately 4,400 pounds of marijuana.

such example of a particularly violent clique that formed in approximately mid-2012. It is well understood among WCC members that the cliques, while distinct, remain part of the WCC. This is due, in large part, to sheer survival. No clique could survive on its own, without drawing on the resources (such as, mutual protection, money, drugs) of the WCC.

16. The WCC is a hierarchical organization with seniority roughly related to a member's age. At the top of the pile are the "Original Gangsters," "OGs," or sometimes just referred to as "G." These are the "shot callers," or decision makers. Most OGs are in their forties or fifties. The OGs generally assume roles that involve less risk, and higher profits, than the less senior gang members. OGs maintain sources for wholesale supplies of narcotics and deal to various sub-distributors, reserving a comfortable margin of profit. OGs will also supply younger gang members with weapons, when needed, to carry out gang operations. OGs depend on younger gang members to maintain discipline by enforcing violations of gang rules or responding to incursions on gang territory. Typically, such enforcement action requires an act of violence or the threat of violence.

17. Below the OGs are the "Homies." A "Homie" is a gang member, typically in his 30s or early 40s, who has already "put in work" [committed acts of violence] for the gang and has thereby earned the trust of his fellow gang members. While the

WCC enterprise does admit women, typically any gang member at "Homie" level is male. In recognition of the trust they have earned, a gang member at this level will typically receive a reduced, "Homie price" for narcotics from other gang members.

18. Below the OGs and Homies are the "Babies," including the "3-Babiez," described above, and the "Young Ridaz." Most of the "Baby" gang members are in their twenties or thirties. This younger generation typically receives narcotics from more senior gang members and deals to street users, or street-level sub-distributors. This generation also manages prostitutes and enforces discipline on gang members and associates in conformity with gang rules. The "Young Ridaz" have earned special recognition as gang members who are capable and willing of going out on "missions" [acts of violence] for more senior gang members.

19. Alongside this formal WCC hierarchy are WCC Associates. While not recognized as WCC gang members, these individuals are closely connected to the WCC and are essential to WCC operations. WCC Associates include drug cartel members, who supply the WCC with narcotics, WCC girlfriends/prostitutes who work for WCC members, and supply them with firearms, vehicles, and credit, and WCC sub-distributors who channel WCC-supplied narcotics to customers that the WCC could not otherwise access.

## B. Criminal Activities of the Target Subjects[2]

**On December 2, 2012, in response to an attack on a WCC member, Defendants FOREMAN, ROSS, and HOLLINS participated in shooting Andres Caldera in the face with a .40 caliber handgun, killing Andres Caldera**

20. On October 31, 2012, WCC member Curtis Williams was assaulted and his car was stolen by Latino gang members in WCC territory. Williams was interviewed later that day and told officers that Latino gang members assaulted him and stole his car.

21. On December 2, 2012, at 10:40 p.m., Andres Caldera was shot once in the face with a .40 caliber handgun on 3200 L Street in San Diego, California. Caldera was pronounced dead on the scene. Caldera was a member of a Latino gang. Two witnesses, in separate statements, told officers that a black male wearing a hoody asked Caldera if Caldera had a cigarette. Caldera said he did not. Caldera asked the male, "where are you from?" The hooded male then yelled, "I am from West Coast," pulled out a gun, fired one shot at Caldera's face, and fled on foot.

22. Cell site evidence puts a cellular phone known to be used by FOREMAN within approximately 1,000 feet of Caldera's body, at the approximate time of Caldera's death.

---

2 Unless otherwise noted, the criminal activities set forth below occurred in the Southern District of California or were directed from an individual located in the Southern District of California.

23. In the weeks following Caldera's murder, HOLLINS and ROSS boasted to a Confidential Informant ("CI")[3] that they shot a Mexican gang member.

**On December 6, 2013, Defendants FOREMAN, HOLLINS and ROSS robbed a business in San Diego, California of approximately $1,000 by brandishing firearms and threatening to "pop" [kill] an employee**

24. On December 6, 2013, FOREMAN, HOLLINS, and ROSS robbed a business in the Logan Heights neighborhood of San Diego. FOREMAN, HOLLINS, and ROSS are all documented members of the WCC and the 3-Babiez subset of the WCC.

25. An employee saw three black men walk through the front door. After entering the business, FOREMAN, wearing a large blue puffy "ski-style" jacket, held a firearm in his hand and ordered another employee to open the cash register. HOLLINS and ROSS each brandished a gun.

26. The employee opened the cash register and one of the robbers grabbed approximately $1,000 in cash. Another robber then had an employee lie down on the

3 The CI was cooperating with authorities for monetary compensation, and for assistance in a pending state case involving possession of a controlled substance. The CI has been convicted of multiple narcotics trafficking offenses, theft offenses, assault with a deadly weapon, and providing false information to a police officer. The CI's most recent narcotics felony conviction is five or more years old, and the CI's criminal history dates back more than fifteen years. The CI supplied information on many matters that has been corroborated through independent sources. Over the course of the investigation, the CI committed unauthorized criminal activity and is being prosecuted for that conduct.

floor, face-down. One robber told another to "pop" the employee on the floor if the employee moved. A different robber, wearing a grey jacket, then pressed his gun into the back of the employee's head and said he would "pop" him if he moved. As one robber held the gun to the employee's head, another ransacked the office. Finding nothing else to steal, the three robbers left the office.

27. Outside, a different employee saw the three men file out of the office. The employee saw a robber tuck a handgun into the front waistband of his pants.

28. As HOLLINS, FOREMAN, and ROSS left the business, a worker at another nearby business saw the three men running south. Shortly thereafter, the worker saw the doors close on a red Chevy Camaro and watched the car drive away.

29. Later that day, local police officers attempted to stop the red Chevy Camaro. The Camaro did not stop, but instead led officers on a high-speed chase.

30. The Camaro eventually stopped on the shoulder of the highway. When it did, FOREMAN and ROSS ran from the passenger side. The driver, HOLLINS, remained in the Camaro. One officer quickly apprehended ROSS while another pursued FOREMAN.

31. As the officer ran after FOREMAN, FOREMAN hid a .40 caliber semi-automatic firearm with a black grip in shrubbery. Officers later recovered the firearm.

32. Back at the Camaro, officers searched the interior and trunk. In the trunk, officers found multiple clothing items, including a blue puffy "ski-style" jacket and a gray jacket.

33. The employees of the business were brought to the scene to see if they could identify the defendants and their clothing. One employee identified HOLLINS as "the first guy who came in." The employee identified the blue and grey jackets in the trunk as the same he saw during the robbery.

34. Another employee identified FOREMAN as one of the robbers.

35. Neither employee could identify ROSS at the scene. However, an employee did identify ROSS at a subsequent hearing in California Superior Court.

36. HOLLINS, ROSS and FOREMAN were each charged with robbery in state court. As a condition of his bail, ROSS was required to wear an ankle bracelet with GPS monitoring.

**On January 23, 2013, Defendant FOREMAN possessed with the intent to distribute ten bindle bags of methamphetamine, two digital scales, and a text message regarding a drug deal**

37. On January 23, 2013, officers executed a probation compliance search on FOREMAN's residence.

38. In the kitchen cupboard, officers found a clear plastic sandwich bag containing ten small bindle bags. Inside the ten bindle bags, officers found a white

substance that tested positive for methamphetamine. Each baggie contained approximately .10 grams of methamphetamine, for a total of approximately 1 gram. Next to the bindles officers found two black digital scales and a bank card bearing FOREMAN's name.

39. Officers further found a cellular phone that FOREMAN admitted to using during a post-Miranda interview. FOREMAN also said that everything found in the apartment belonged to him, and that he did not use meth.

**On April 6, 2013, Defendants ROSS, HOLLINS, and COOK participated in the killing of Meashal Fairley over an argument regarding Fairley's suspected cooperation with law enforcement**

40. On April 7, 2013, at approximately 5:25 a.m., police officers received information regarding a homicide in front of a San Diego night club. The club is known to be a frequent meeting place for WCC members. A witness called police and said that s/he found Meashal Fairley in the street with a gunshot wound to his head.

41. An employee at the club said s/he did not see the shooting, but heard the shot, was at the door to the club shortly after, and saw a black Dodge Magnum leave the area. The black Dodge Magnum was parked a few feet from Fairley's body.

42. Officers collected a cigarette butt next to where the black Dodge Magnum had been parked. Lab results from the San Diego Police Department, Forensic

Biology Unit, show that COOK and HOLLINS are possible major contributors to the DNA profiles taken from the cigarette butt, and that it is highly improbable that any other person contributed to that DNA profile.

43. A condition of ROSS' bail following the December 2012 robbery required ROSS to wear an ankle bracelet with a GPS tracking device. ROSS' GPS device placed him within several feet of the location where Fairley's body was found, at the time when the club employee told officers that he heard a gunshot. ROSS' GPS device then showed him travelling directly from the scene of Fairley's body to HOLLINS' residence.

44. On April 11, 2013, ROSS' girlfriend told officers that in April 2013 she was leasing a black Dodge Magnum.

45. On November 11, 2013, at approximately 10:34 a.m., GRAVES spoke to WCC member Titus Fisher (charged elsewhere) about Fairley's murder. During the intercepted conversation, GRAVES said that HOLLINS was not the shooter "but he was there" and it was HOLLINS' 3-Babiez clique that killed Fairley.

**On August 8, 2013, Defendant GRAVES sold 33.9 grams of methamphetamine (actual) to a CI for $900**

46. On August 8, 2013, FBI agents conducted a controlled purchase[4] of 33.9

---

4 A "controlled purchase" is a purchase audiotaped, videotaped, and observed by agents. The CI involved was searched prior to and after the transaction. All substances purchased field-tested positive for the presence of the

grams of methamphetamine (actual) from GRAVES for $900.

**On August 15, 2013, Defendant GRAVES sold 50.9 grams of methamphetamine (actual) to CI for $1,240**

47. On August 15, 2013, FBI agents conducted a controlled purchase of 50.9 grams methamphetamine (actual) from GRAVES for $1,240.

**On August 20, 2013, Defendant GRAVES sold 25.8 grams of methamphetamine (actual) and approximately 3.9 grams of crack cocaine to CI for $940**

48. On August 20, 2013, FBI agents conducted a controlled purchase of 25.8 grams of methamphetamine (actual) and approximately 3.9 grams of crack cocaine from GRAVES for $940.

**On August 28, 2013, Defendant BUTLER agreed to sell $40 worth of crack cocaine to an undercover police officer soon after exchanging a text message with Defendant GRAVES regarding other drug sales**

49. On August 28, 2013, an Undercover Officer ("UC") approached Larry Allen (charged elsewhere) on a street corner in downtown San Diego. This corner is well known as a place where crack cocaine can be purchased. The UC asked Allen for a "dub" [$20 worth of narcotics]. Allen said he would only sell $40. The UC accepted and handed Allen $40, in two marked $20 bills, in exchange for two small rocks of crack cocaine weighing 0.09 grams. Allen immediately walked to a nearby vehicle

---

suspected controlled substance (that is, methamphetamine or cocaine). For the controlled purchases involving GRAVES, the CI (described in footnote 3) was employed to purchase narcotics from GRAVES.

and got in the rear seat. Before getting into the car, the UC overheard Allen telling BUTLER, in the driver's seat, "he got it." Shortly thereafter officers arrested Allen and BUTLER. BUTLER had the two marked $20 bills in his pocket. BUTLER also had a cellular phone in his possession.

50. The officer examined the cellular phone and saw text messages showing recent drug transactions, including a text message to GRAVES saying: "Whr? I just hit da corner n hit hood bout to go get dis other tip" [drug deal]. Another text message stated: "I'm on H street in natl city. Will throw you $20 if you can deliver."

**On October 10, 2013, Defendant GRAVES sold 20.5 grams of methamphetamine (actual) and approximately 5.73 grams of crack cocaine for $900**

51. On October 10, 2013, FBI agents conducted a controlled purchase of 20.5 grams of methamphetamine (actual) and approximately 1/4 ounce (5.73 grams) of crack cocaine from GRAVES for $900.

**On October 25, 2013, Defendant ROSS and a group of WCC members assaulted and robbed AH and AG to collect a debt owed to ROSS for a prior drug deal; during the assault, AH pulled out a knife and stabbed Jeffrey "JJ" Rees in the heart, killing him**

52. On October 25, 2013, Jeffrey "JJ" Rees was killed in the parking lot of a fast-food restaurant in San Diego. The events of October 25, 2013, were precipitated by a verbal dispute between ROSS and AH.

53. AH told officers that sometime in October 2013, AH rented a car for ROSS.

However, ROSS kept the car too long. According to AH, AH called ROSS numerous times in an attempt to get the rental car back. During one of those calls, AH screamed at ROSS about the car. The conversation ended with ROSS agreeing to return the car. ROSS and AH agreed to meet at a fast-food restaurant parking lot.

54. On October 25, 2013, at approximately 3:00 p.m., AH and his companion AG drove to the agreed-upon fast-food restaurant. AH told officers that as he and AG got out of their car, a group of WCC members led by ROSS came out from behind a wall and encircled them. The males began beating AH and AG.

55. AH told officers that he tried to escape in his car, but Crip gang members surrounded and punched him. Jeffrey "JJ" Rees led the attack. AH pulled out a knife and stabbed Rees in the chest, killing him. AH and AG then escaped.

56. WCC member Paris Hill, aka "Binkie," was at the scene and was interviewed by officers after the incident. Hill gave a statement to officers regarding the incident. Documents indicating that Hill provided that statement were released in January 2014. As set forth below, Hill was killed for giving that statement to the police.

**On October 26, 2013, Defendants COOK and FOREMAN were involved in a high speed pursuit and participated in shooting at another vehicle**

57. Witnesses told officers that on the evening of October 26, 2013, as three individuals rode in a Ford Explorer, a Nissan pulled up behind them and started

shooting. Approximately six shots were fired. The Nissan passed the Explorer while shots were fired.

58. The car chase ended in a crash in which both vehicles sustained extensive damage. Witnesses told officers that the occupants of the Nissan fled on foot. Shell casings were collected from the street and inside the Nissan, and a bullet hole pierced the Nissan's driver's side door.

59. The registered owner of the Nissan told officers that s/he had been out drinking that evening, was too drunk to drive home, drove home with a friend, left his/her car on the street, and that someone had stolen his/her car.

60. The Nissan was dusted for fingerprints. Fingerprint matches were found for COOK on the passenger side door frame and FOREMAN on the rear view mirror.

**On November 1, 2013, following Chyrene Borgen's murder, Defendants FOREMAN, HOLLINS, ROSS, and COOK publicized their dominance within the WCC with photos of themselves at the scene of Chyrene Borgen's murder**

61. On November 1, 2013, at approximately 3:57 a.m., a 911 dispatcher received a call from a witness regarding a shooting that had just occurred across the street from the witness' location. The victim was WCC associate Chyrene Borgen. The witness said s/he saw a male in a blue hooded sweatshirt running from the scene. Officers responded within minutes. Borgen was pronounced dead at 4:04 a.m.

62. Borgen was close[5] to Meashal Fairley, who was murdered on April 6, 2013. Wire intercepts by WCC members confirm that Borgen was vocally critical of the 3-Babiez for what she perceived to be the 3-Babiez's connection to Fairley's murder in April 2013.[6]

63. Borgen was attending a Halloween party the night she was killed. In intercepted calls and text messages between midnight and 2:00 a.m. on November 1, 2013, LAGRONE described to GRAVES seeing Borgen at the party. In the hours after the shooting, GRAVES discussed the shooting with several WCC members:

a. On November 1, 2013, at approximately 10:35 a.m., LAGRONE spoke to GRAVES about the people present at the party. During the intercepted call, LAGRONE told GRAVES that BUTLER and HOLLINS were present at the party with Borgen.

b. On November 1, 2013, at approximately 11:48 a.m., a WCC associate also spoke to GRAVES about the people present at the party. During the

---

5 Officers saw that Borgen had Fairley's moniker tattooed on her body.

6 As noted above, law enforcement agents handling this investigation sought and received court authorization to conduct wiretaps on various WCC members' telephones. Unless otherwise noted, when I reference a call or a text message, that call was intercepted pursuant to a court-authorized wiretap. In addition, unless otherwise noted, where calls are attributed to a particular defendant, the identification is based on, among other things, agents' experience listening to numerous intercepted phone calls, internal references to the callers' identity, and physical surveillance.

intercepted call, the WCC associate said that there was suspicion that Borgen was "doing a little telling" [cooperating with law enforcement authorities]. GRAVES then told the WCC associate that BUTLER told him, GRAVES, that BUTLER and HOLLINS were present at the Halloween party. GRAVES said "they were clowning her" [making fun of her].

c. On November 1, 2013, at approximately 8:12 p.m., GRAVES and SHELTON spoke about the shooting. During the intercepted call, they discussed that it was a "homie" [a WCC member] who did it and referenced an argument in an alley just prior to the shooting. They discussed how Borgen was "talking too much."

d. On November 1, 2013, at approximately 11:59 p.m., GRAVES and BUTLER discussed Borgen's murder. During the intercepted call, GRAVES asked BUTLER, "your boy did that, huh? BUTLER said, who "three" [referencing HOLLIN's moniker, "Caby-3"]. GRAVES said, "no, Miss" [referencing FOREMAN's moniker, "Missle"]. BUTLER acknowledged that he said "that" to another WCC associate.

e. Shortly after Borgen's murder, HOLLINS, FOREMAN, ROSS, COOK, and Antoine Roberts (charged elsewhere) took photographs of themselves making WCC gang signs at the scene of Borgen's murder.

HOLLINS is wearing a sweatshirt, stating "3 BABIEZ, YELLOW TAPE GANG, ANYBODY KILLA." The photographs were widely circulated on Facebook in the days following Borgen's murder. At about that same time, HOLLINS and COOK appeared on a cell phone video along with other members of the 3-Babiez WCC clique in which, as a group, they boasted about how they are willing to kill anybody, including women.

**On November 2, 2013, Defendant GRAVES agreed to sell to Defendant LEON FRANKLIN 1/4 ounce of crack cocaine and 1/4 ounce of powder cocaine**

64. On November 2, 2013, at approximately 1:52 p.m., FRANKLIN called GRAVES to request narcotics. During the intercepted call, FRANKLIN asked for "two sevens, one hard [crack cocaine] one soft [cocaine]." GRAVES responded, "I got you."

**On November 3, 2013, Defendants GRAVES and HARRISON conducted a narcotics transaction**

65. On November 3, 2013, HARRISON requested to meet with GRAVES to obtain narcotics. At approximately 12:54 p.m., HARRISON sent GRAVES an intercepted text message stating "can ya git wit me" [can you get with me]. In a subsequent intercepted text message, GRAVES said: "Cant C riding round with dis [narcotics]." Then, during an intercepted call at approximately 2:24 p.m., GRAVES and HARRISON agreed to meet at a fast-food-restaurant on Euclid Avenue.

**On November 4, 2013, Defendants BUTLER and GRAVES discussed acquiring methamphetamine for redistribution to others**

66. On November 4, 2013, at approximately 9:58 a.m., BUTLER called GRAVES to discuss acquiring methamphetamine. During the intercepted call, BUTLER said that another drug dealer offered him "crystal" [methamphetamine] and said they could make $200 per day working "the spot," but BUTLER did not think it would be worth it to be sitting around all day waiting for customers. BUTLER also said another person asked him for a "half" [14 grams], but BUTLER did not want to sell him that quantity for what BUTLER called the "player price" because BUTLER would not make enough money from that transaction. GRAVES approved BUTLER's decision.

**On November 4, 2013, Defendant GRAVES agreed to sell to Defendant FRANKLIN 1/4 ounce of cocaine**

67. During an intercepted call on November 4, 2013, at approximately 9:44 a.m., FRANKLIN asked GRAVES for "seven soft [cocaine]." GRAVES and FRANKLIN agreed to meet at a nearby restaurant. At approximately 10:10 a.m., FRANKLIN sent GRAVES a text message confirming that he was waiting for GRAVES.

**On November 4, 2013, Defendant GRAVES agreed to sell Defendant FRANKLIN 1/4 ounce of cocaine in exchange for $320**

68. On November 4, 2013, at approximately 4:21 p.m., FRANKLIN sent

GRAVES an intercepted text message stating, "I need a 7 i got 320 [$320]." In another text message, FRANKLIN clarified that he needed, "soft" [cocaine]. GRAVES responded, "Wes."

**On November 4, 2013, at 5:25 p.m., Defendant BUTLER brokered the sale of 1/8 of an ounce of narcotics with Defendant GRAVES**

69. On November 4, 2013, at approximately 5:25 p.m., BUTLER called GRAVES and referenced a female he was with. During the intercepted call, BUTLER said the female wanted an "8 ball" [3.5 grams, 1/8 of an ounce of narcotics]. GRAVES responded that he would see BUTLER in 10 minutes.

**On November 5, 2013, Defendant GRAVES sold Defendant FRANKLIN 1/4 ounce of cocaine and 1/8 of an ounce of crack cocaine**

70. On November 5, 2013, at approximately 11:45 a.m., FRANKLIN called GRAVES to request narcotics. During the intercepted call, FRANKLIN requested "7 soft" [cocaine] and "a ball hard" [crack cocaine]. Officer surveillance confirmed a meeting between FRANKLIN and GRAVES later that day.

**In November 2013, Defendant GRAVES supplied Defendant LAGRONE with one ounce of cocaine**

71. On November 7, 2013, at approximately 7:08 p.m., GRAVES and SHELTON discussed their drug operation, including LAGRONE's role in that operation. During the intercepted call, GRAVES complained to SHELTON that despite giving LAGRONE narcotics to sell, LAGRONE just wanted to "shop,"

"smoke weed," and lay around. GRAVES said he provided LAGRONE with a "whole one" [an ounce of cocaine], but now she was down to a "half" [14 grams of cocaine] and she ignored his advice and was "going backwards" [selling smaller quantities of narcotics].

**On November 8, 2013, at the direction of Defendant GRAVES, Defendant CASTRO-HERNANDEZ traveled from the Southern District of California to the District of Arizona to work as a prostitute and, with her earnings, purchase firearms and ammunition for GRAVES**

72. On November 8, 2013, GRAVES sent CASTRO-HERNANDEZ to Arizona to work as a prostitute and, with her earnings, purchase firearms and ammunition. Agents intercepted numerous phone calls regarding CASTRO-HERNANDEZ's prostitution business. For example, on November 10, 2013, at approximately 11:55 a.m., CASTRO-HERNANDEZ spoke to GRAVES about her customer the night before. CASTRO-HERNANDEZ said "he" asked her if she did "over nights" and how much she would charge. CASTRO-HERNANDEZ said she would charge $1,500. GRAVES said she was doing well and would double what she did "last time." Then, on November 13, 2013, at approximately 9:25 a.m., GRAVES and CASTRO-HERNANDEZ discussed setting up an erotic website which her clients could use. During that week, agents followed CASTRO-HERNANDEZ out to Arizona and saw her check into a hotel, and drive to the places she described visiting over the phone.

73. On November 15, 2013, at approximately 7:05 p.m., GRAVES spoke to BUTLER about CASTRO-HERNANDEZ's earnings in Arizona. During the intercepted call, GRAVES told BUTLER that CASTRO-HERNANDEZ earned $2,500 prostituting in Arizona. GRAVES then boasted about taking $2,350 of that money and leaving CASTRO-HERNANDEZ with $150.

**Between November 8, 2013, and November 12, 2013, Defendant GRAVES negotiated a deal with WCC member Titus Fisher whereby Fisher would broker a deal with another person to sell GRAVES a fully automatic assault rifle for $2,500**

74. While CASTRO-HERNANDEZ was earning money as a prostitute in Arizona, GRAVES negotiated a deal with WCC member Titus Fisher (charged elsewhere) for an assault rifle.[7] On November 5, 2103, at approximately 4:31 p.m., Fisher sent GRAVES an intercepted text message stating: "He [the owner] got two AKs [assault rifles].....one for 1800 $..one for 2500 $ fully tactical." At approximately 4:36 p.m., GRAVES forwarded Fisher's text message to BUTLER. At approximately 4:53 p.m., GRAVES sent Fisher an intercepted text message, "Ak fully" [requesting the fully automatic AK-47 assault rifle]. However, CASTRO-HERNANDEZ was unable to earn enough money in time to meet Fisher's deadline and the firearm transaction never happened.

---

7 Agents followed CASTRO-HERNANDEZ to Arizona and were prepared to seize any illegal weapons she might acquire for GRAVES.

**On November 9, 2013, Defendant GRAVES sold Defendant WHITTLE 1/8 of an ounce of narcotics**

75. On November 9, 2013, WHITTLE called GRAVES to request narcotics. During the intercepted call, WHITTLE request a "Q" [quarter ounce of narcotics]. GRAVES responded, "damn, all I got is a ball [1/8 ounce of narcotics] on me." WHITTLE and GRAVES agreed to go forward with the meeting anyway.

**On November 12, 2013, Defendant GRAVES agreed to purchase $5,600 worth of marijuana from Defendant JACKSON**

76. On November 12, 2013, at approximately 3:15 p.m., GRAVES called JACKSON to purchase marijuana. During the intercepted call, GRAVES said he had something he was trying to put together. GRAVES asked, "what do they look like, they look good?." JACKSON responded, "yes sir." GRAVES then asked, "whats the number?" JACKSON said, "56" [$5,600]. GRAVES said he wanted "10 good ones" and said he would be by the next day.

**On November 13, 2013, Defendants GRAVES, SHELTON, and JACKSON negotiated the purchase of marijuana for redistribution**

77. On November 13, 2013, at approximately 5:11 p.m., GRAVES called SHELTON to discuss the purchase of marijuana. During the intercepted call, GRAVES said that he was looking at marijuana. GRAVES further said the marijuana was "brownish-green . . . [i]t's got some green . . . but it [marijuana] look more brown." SHELTON said that they needed it "as green as possible."

78. At approximately 8:15 p.m., GRAVES spoke to SHELTON again, having just visited JACKSON, and said the marijuana was in a "brick," and they "bust the brick in half and some started to change colors." GRAVES asked SHELTON, "which one do you want me to shoot it to you . . . which drop zone?" SHELTON said "the Melrose." They then agreed not to "seal it" pending further confirmation. Later that evening, GRAVES sent SHELTON a text message stating: "Wes. Im ready 2 seal it holla." SHELTON responded: "5 ½? That other thing im gonna find out about b4 i leave." GRAVES replied: "Which drop zone again?" SHELTON texted back: "2600."

**On November 26, 2013, Defendants GRAVES and SHELTON agreed to purchase marijuana from Defendant JACKSON for redistribution**

79. On November 26, 2013, GRAVES and SHELTON agreed to do another drug deal with JACKSON. At approximately 12:19 p.m., GRAVES spoke to SHELTON. During the intercepted call, GRAVES said that he was going to visit JACKSON to see what was going on and "go from there." In another intercepted call, at approximately 12:33 p.m., GRAVES added that after he went to "Bopper's" [JACKSON's location] to "look at it [marijuana]," GRAVES would tell JACKSON that SHELTON would pick up the marijuana and drop-off the "bread" [money]. GRAVES asked SHELTON how much "bread" he had. SHELTON said "43" [$4,300].

80. At approximately 1:02 p.m., GRAVES called SHELTON and said he had just left JACKSON's location and "they [the marijuana] nice. Real nice. Ticket high though . . . He want 565." After some discussion, GRAVES and SHELTON agreed to "make a move" [purchase the marijuana]. GRAVES said there were other people trying to buy the marijuana, so he would tell JACKSON to put "10 on hold." SHELTON agreed, saying "fo sho." GRAVES later told SHELTON to drop-off the "43" [$4,300] with JACKSON. GRAVES then sent JACKSON a text message, saying "Wes. Gun [SHELTON] comin wit it [money] N im come wit da rest n pick up. Bout 7:30p. Is dat cool? JACKSON responded, "Cool."

**On November 1, 2013, Defendant GRAVES agreed to buy "two" kilograms of cocaine from Defendant SALGADO-VISCARRA, for approximately $26,000 per kilogram, one of which GRAVES and SHELTON sold to an out-of-state purchaser for $28,500 in cash**

81. On November 1, 2013, at approximately 5:54 p.m., GRAVES spoke to SALGADO-VISCARRA about cocaine. During the intercepted call, GRAVES said that he talked to "the people" [drug purchasers] and that "they [drug purchasers] want two [narcotics units]." GRAVES further stated that "he" [drug purchaser] will send the "money" to him "over here" [San Diego]. GRAVES reaffirmed that "he wants it for sure." Based on a subsequent call in which GRAVES discussed SALGADO-VISCARRA's price for a kilogram of cocaine, I believe that GRAVES paid

approximately $26,000 per kilogram.[8]

82. Between November 5 and November 6, 2013, GRAVES and a purchaser in another state negotiated the purchase of one kilogram of cocaine. Set forth below are intercepted calls and an intercepted text message relating to the cocaine deal between GRAVES and the purchaser.

a. On November 5, 2013, at approximately 8:04 p.m., the purchaser told GRAVES that s/he was "ready" to send GRAVES the money for the cocaine. GRAVES responded: "You know the number . . . 28,500 [$28,500]." GRAVES said that he would send a text message to the purchaser with an address.

b. On November 5, 2013, GRAVES sent the purchaser a text message with a P.O. box number in Santee, California.

c. On November 6, 2013, the purchase told GRAVES that s/he had just sent the money. GRAVES told the purchaser that he would send the drugs on Monday.

83. On November 7, 2013, GRAVES exchanged a number of intercepted text messages with SALGADO-VISCARRA regarding the quantity of narcotics and the

---

8 On February 6, 2014, at approximately 1:26 p.m., GRAVES told CASTRO-HERNANDEZ that SALGADO-VISCARRA was charging him "27" [$27,000] and "26" [$26,000] per kilogram for cocaine.

time and location for their meeting. At approximately 4:21 p.m., GRAVES sent SALGADO-VISCARRA a text message saying, "Dos para manana. Puta" ["Two [two kilograms of cocaine] for tomorrow. Whore."] At approximately 5:49 p.m., SALGADO-VISCARRA sent GRAVES a text message saying "Esta confirmado manana al las 8." ["It's confirmed, for tomorrow at 8:00."] GRAVES responded, "Seguro mija?" ["You sure, honey?"] SALGODO-VISCARRA said, "Seguro puto a las 8" ["At 8:00 for sure, whore."] They both agreed to be on the road by 6:00 a.m.

84. Early in the morning of November 8, 2013, agents observed GRAVES leave his residence, get on the freeway, and head northbound on Interstate 5. Using air and ground surveillance, agents followed GRAVES to an apartment complex in Orange County, California. At approximately 8:50 a.m., just before pulling into the apartment complex, GRAVES called BUTLER. During the intercepted call, GRAVES said: "I'm up here fixin to get some work [narcotics] right now." Agents then observed GRAVES and SALGADO-VISCARRA meet briefly with an unknown individual. GRAVES left the meeting with a package in his hands.

85. Later on November 8, 2013, the U.S. Postal Service in Santee, California received a parcel package. Agents obtained a search warrant and opened the package. Inside, agents documented approximately $28,000 in U.S. currency. After photographing the approximately $28,000, agents placed the package back inside the

Post Office Box. GRAVES signed for the package next day, November 9, 2013.

86. After confirming receipt of the $28,000, GRAVES called the purchase of narcotics. During the intercepted call, GRAVES told the purchaser that he would send him the narcotics. GRAVES then sent the purchaser a text message with a tracking number. Pursuant to a search warrant, agents opened the package with that tracking number and found approximately 1.13 kilograms (approximately 2.6 pounds) of a substance that field tested positive for cocaine. Agents seized the cocaine and sent it to the laboratory for further testing.

87. The seizure of the package resulted in several intercepted conversations between GRAVES, the purchaser of cocaine, and SHELTON.

a. On November 15, 2013, at approximately 9:08 a.m., GRAVES and the purchaser discussed the missing package. During the call, the purchaser told GRAVES that the package was in transit. GRAVES then told the purchaser that they "were still in the ball game" and indicated that as long as the packaged had left San Diego, he believed they would be fine.

b. On November 19, 2013, at approximately 8:17 a.m., GRAVES spoke to SHELTON about the missing package. SHELTON referenced tracking the package online and said it was still in transit. SHELTON said that if the package did not make it, he is "done with [the purchaser's location]."

Subsequent calls indicate that SHELTON was in the purchaser's state speaking with narcotics customers.

c. On November 20, 2013, at approximately 8:18 a.m., GRAVES and SHELTON discussed quantities of narcotics they sent out and the "profit margin." After running through a series of numbers, GRAVES said, "profit margin is what? Like 22?" SHELTON said it was "somewhere around there." GRAVES then corrected himself and said it would be "18 . . . that's what the profit margin is going to be."

d. On November 24, 2013, GRAVES received a text message from the purchaser providing a street address.

e. On November 25, 2013, GRAVES spoke to the purchaser about replacing the missing cocaine. GRAVES said that this was their "first get down" and he did not want the purchaser to take the hit all on his own, and that he would "share in some of the hit." The purchaser indicated that GRAVES' proposal was acceptable: "credit man and shoot some back [GRAVES would give the purchaser credit for the missing cocaine and would provide a partial replacement]." GRAVES said "that will work." GRAVES concluded, "I got you, don't even trip."

f. On November 26, 2013, GRAVES forwarded SHELTON the same

address that GRAVES had earlier received from the purchaser. Based on this series of communications, I believe that GRAVES texted SHELTON that address so that SHELTON could send the replacement narcotics to the out-of-state purchaser.

**On November 30, 2013, Defendant GRAVES boasted his status within the WCC by stating that he was "highly decorated" within the WCC because he had "5, 6 bodies" [killed 5 or 6 people]**

88. The existence of the WCC as an enterprise is demonstrated through numerous intercepted calls in which GRAVES discussed the structure, hierarchy, and inter-relationship of the WCC and its sub-sets. For example, in November 2013, GRAVES was upset at the discord that the 3-Babiez clique was causing and the lack of respect the 3-Babiez showed to OGs. At approximately 12:20 p.m., GRAVES received a call from an individual, in which GRAVES discussed his position with regard to the 3-Babiez clique. During the intercepted call, GRAVES boasted:

> I got multiples on my jacket nigga . . . I don't think its too many mother fuckers [as] highly decorated the way I am. I know I got 5, 6 bodies [killed 5 or 6 people] and it ain't no homies . . . Niggas be talking but I be like damn, nigga you ain't even put in work [committed violent acts on behalf of the WCC]. Then you barely started gang banging . . . I got 35 years in and ain't been around here flexing my muscle cause I'm a G [senior gang member] and everybody respects me . . . I tell them [the 3-Babiez] the same thing I'm telling you . . . Caby [HOLLINS], Missile [FOREMAN], all of em . . . Stone [FRANKLIN] . . . I know everybody got their cliques but still niggas supposed to respect West Coast . . . I got so many phone calls about these niggas doing this. I don't have no problems

with the homies. They don't trip with me . . . They respect me as a G, I respect them as young riders.

**On December 3, 2013, Defendants GRAVES and CASTRO-HERNANDEZ mailed packages containing narcotics from a San Diego-area U.S. Post Office and Federal Express Office**

89. After GRAVES realized that the package of cocaine sent on November 12, 2013, had probably been seized, he regretted sending it with his own hands. On November 20, 2103, at approximately 10:21 a.m., in an intercepted call, GRAVES indicated that he wished he would have had the "bitch" [CASTRO-HERNANDEZ] mail the packages with narcotics to avoid being caught.

90. Then, on December 3, 2013, at the direction of GRAVES, CASTRO-HERNANDEZ mailed two additional packages using Federal Express and the U.S. Post Office. At approximately 2:26 p.m., CASTRO-HERNANDEZ mailed a package using a Federal Express office. Agents photographed GRAVES standing near the U.S. Post Office in Santee, California, which is close to a Federal Express office, with a phone to his ear directing CASTRO-HERNANDEZ where to put the package. Agents also photographed CASTRO-HERNANDEZ carrying large boxes in front of the Federal Express office and U.S. Postal Office.

91. During the mailing of the packages, agents intercepted telephone conversations between CASTRO-HERNANDEZ and GRAVES. In one conversation, CASTRO-HERNANDEZ told GRAVES: "it says number 214 so I'm

assuming that's an apartment number." GRAVES responded, "yeah, that's the Fed Ex one."

92. After CASTRO-HERNANDEZ successfully mailed the packages, GRAVES told her not to lose the two receipts. Subsequent intercepted calls and text messages between GRAVES and SHELTON indicate that CASTRO-HERNANDEZ kept the receipts at **Target Location #2**. On December 3, 2013, SHELTON sent GRAVES a text message asking when the packages would arrive. GRAVES texted back, "Dnt know da mami bitch [CASTRO-HERNANDEZ] got paper. Let U knw later." SHELTON asked GRAVES the status of the packages again the next day and GRAVES said he "didn't make it back over there to where the bitch at [**Target Location #2**] she got the slip over there though." Later that day, GRAVES texted SHELTON the tracking number. When GRAVES sent that text message his cell phone used the same cell phone tower that it used on numerous occasions when GRAVES, on the call, indicated that he was at **Target Location #2**.

**On November 19, 2013, Defendant GRAVES announced to a WCC associate that 3-Babiez members were going to "get" [kill] KS**

93. On December 1, 2013, at approximately 6:20 p.m., WCC and 3-Babiez member Antoine Roberts (charged elsewhere) shot WCC member KS in the chest with multiple bullets. KS is a self-described WCC gang member and was three months pregnant when Roberts shot her. KS told officers that Roberts was the

shooter. Other witnesses also named Roberts as the shooter. KS's shooting was connected to the April 2013 murder of Meashal Fairley, and the November 1, 2013, murder of Fairly's friend, Chyrene Borgen. As noted above, intercepted conversations indicate that WCC members believed that Borgen was overtly critical of the 3-Babiez, in violation of gang protocol. KS and her fetus survived.

94. KS was a close friend to Borgen. KS believed that Antoine Roberts shared responsibility for Borgen's murder. As a result, KS was overtly critical of Roberts and the 3-Babiez on Facebook and in conversation with other gang members. KS told detectives that at Borgen's funeral on November 18, 2013, Roberts showed KS a gun and mouthed the words, "I'm going to kill you." Sometime after the funeral, KS assaulted Roberts with a dog chain in front of other gang members. Following that incident, agents intercepted calls to GRAVES in which the participants discussed Roberts' desire to kill KS. For example, on November 19, 2013, at approximately 8:53 p.m., discussing Borgen's death with GRAVES, a caller said KS was "next." GRAVES agreed and said, "they gonna get [kill] that bitch [KS]."

95. KS agreed to cooperate with the government in charging Roberts for attempted murder. KS' decision to cooperate with law enforcement immediately sent ripples throughout the WCC community, ultimately resulting in gang shot callers agreeing that KS should be murdered as a direct result of her cooperation. This is

illustrated by several intercepted calls in the days following the shooting:

a. On December 2, 2013, at approximately 11:46 a.m., the day after KS was shot, BUTLER called an unidentified female and discussed the shooting. The female noted that KS was "marked for death at this point" and "can't just throw the homie's name out there like that . . . ."

b. On December 6, 2013, at approximately 10:30 p.m., GRAVES spoke with a WCC member about KS cooperating with law enforcement. GRAVES said, "this is where I got the problem at . . . she is playing gangster dog but she is snitching." The WCC member then said, "Man, if she tell on him she will tell on me." GRAVES referenced the possibility that the 3-Babiez might attack KS in the hospital ("mount up, load up and y'all go handle this shit"), and concluded: "the message has been that for years – you snitch you go, period. You keep running your mouth and the nigger catch you slipping, the mother fucker knock [kill] you . . . we live by that – we all understand and know that regardless." The WCC member agreed.

**On December 6, 2013, Defendant GRAVES gave Defendant BUTLER a loaded revolver, BUTLER threw the gun out of his window during a high-speed pursuit, and GRAVES attempted to retrieve it from the roadside**

96. On December 6, 2013, BUTLER called GRAVES to borrow a firearm. During the intercepted call, BUTLER asked to borrow a gun from GRAVES.

GRAVES agreed, but said he needed to go to **Target Location #1** to get "the one" [firearm]. Agents attempted to disrupt the meeting by arranging a fake traffic stop (a marked police unit pulled over an undercover police unit) directly in front of **Target Location #1** and remained there for over an hour. BUTLER persisted and GRAVES eventually left his home and arranged to meet BUTLER at a different location.

97. After observing the meeting, agents attempted to initiate a traffic stop on BUTLER's vehicle, driven by another gang member (charged elsewhere). The driver refused to yield to police and led officers on a high-speed chase for over an hour, during which BUTLER threw the gun out of the car window.

98. During the high-speed chase, BUTLER called GRAVES – sirens can be heard in the background. During the intercepted call, BUTLER told GRAVES where he threw the gun. GRAVES agreed to try and retrieve the gun from the roadside. By the time GRAVES arrived, police were already on the scene and had blocked off the area. Agents found the gun, a fully loaded .357 Smith & Wesson revolver with serial number 3286.

99. On December 7, 2013, GRAVES described the prior night's events to SHELTON. During the intercepted all, after describing the chase to SHELTON, GRAVES said that FOREMAN, ROSS, and HOLLINS were in another car with two guns of their own following BUTLER's car. GRAVES confirmed that the gun was

loaded and said that the whole group planned to go to a club.

**On December 30, 2013, Defendant GRAVES sold Defendant WHITTLE 1/8 of an ounce of narcotics**

100. On December 30, 2013, WHITTLE called GRAVES to request narcotics. During the intercepted call, WHITTLE asked if GRAVES had an "extra ball" [another 1/8 of an ounce of narcotics] with him. GRAVES said he did not, but indicated he would be able to go ahead with the sale of the narcotics he already had on him. GRAVES then confirmed that he saw WHITTLE walking toward him.

**On December 24, 2013, Defendant GRAVES delivered to Defendant HARRISON three grams of crack cocaine, consistent with multiple prior transactions, for redistribution**

101. On December 24, 2013, HARRISON sent GRAVES an intercepted text message complaining that GRAVES shorted him. GRAVES responded, "its 3 like always."

102. On February 13, 2014, after agents intercept calls and text messages setting up a meeting between HARRISON and GRAVES, agents found a bag hidden between HARRISON's buttocks containing 2.99 grams of crack cocaine.

//

//

//

//

**On December 30, 2013, Defendant GRAVES, aided by Defendants CASTRO-HERNANDEZ, recruited Defendant SHELTON and YOUNG to assist in unloading and transporting 5,000 pounds of marijuana smuggled into the United States by boat in a deal brokered by Defendant SALGADO-VISCARRA**

103. On December 30, 2013, at approximately 11:28 a.m., GRAVES called SHELTON, explained the details of a plan to bring a boatload of marijuana into the U.S., and sought SHELTON's help. During the intercepted call, GRAVES told SHELTON that he had recently met with the "old dude" [SALGADO-VISCARRA]. Their intercepted conversation continued:

> GRAVES: This fool [SALGADO-VISCARRA] is fixin to kick off the New Year in a big way. They talk about 5,000 [5,000 pounds of marijuana] 2 tons, each one 2,500, and they want me to roll [participate], right; they need me, I need you and I'm taking Stinker [YOUNG], and we are gonna roll up the way [travel to Central California] to go part with it and then we get to do whatever we wanna do and he is gonna bring the number down, the number gonna be like 515-500 [$515-$500 dollars per pound.
>
> SHELTON: Well let's run it.
>
> GRAVES: And look, we can do whatever we need to do he gonna trust me to do whatever. He [SALGADO-VISCARRA] said man I already told them [sources] about you, I already know I can trust you, that's the only reason why I'm taking you, we gonna know where they are dropping them [marijuana] at where they putting them at cause we are gonna go help load them and all that [help offload/load the marijuana], and he gonna hit a nigga with a rack [$1,000] and pay for all our expenses for our travel.
>
> SHELTON: Sounds good to me . . . .

GRAVES: You already know how they are coming; they are coming in the Sub [submarine/boat]. You know what I mean? He got like 3-4 paisas [Mexican nationals] and they sending two from down the way . . . that are supposed to be the security guard . . . and then we are going to rent RV's up the way. They are paying for all that, they paying for everything. They have like 12 racks [$12,000] in this bitch and after everything is paid for and done, he [SALGADO-VISCARRA] pay everybody, whatever is left he will split it up amongst 'em.

SHELTON: Ah yeah.

104. The next day, December 31, 2013, at approximately 12:54 p.m., GRAVES and SALGADO-VISCARRA spoke of the expected drug shipment and arranged to go scout out a landing spot for the boat.

105. On January 3, 2014, CASTRO-HERNANDEZ rented a car in her name and gave it to GRAVES. At approximately 10:49 a.m., GRAVES spoke to SALGADO-VISCARRA. During the intercepted call, GRAVES said that he had a car. While still in San Diego, GRAVES stopped at a restaurant, and went inside. Pursuant to a state-court tracker warrant, agents attached a GPS tracker to the rental car. GRAVES then continued north. The tracker data showed that GRAVES drove to Lompoc, California and visited several remote beaches. Subsequent intercepted calls indicate that GRAVES and SALGADO-VISCARRA were later together in Lompoc.

106. At approximately 9:50 p.m., GRAVES called SHELTON from Lompoc, California. During the intercepted call, GRAVES said that the "two little sites" [two possible landing spots] looked "prosperous."

107. On January 6, 2014, pursuant to intercepted calls indicating a meeting between SHELTON, GRAVES and YOUNG discussing their upcoming trip to Lompoc, agents conducted surveillance on all three men and saw them meet at **Target Location #1**. Between January 6 and January 10, 2014, GRAVES continued to make arrangements for the trip. The result was that GRAVES, SHELTON, YOUNG, and a fourth individual agreed to drive to Lompoc, California, where they would meet SALGADO-VISCARRA, unload the narcotics from the boat, load them into their own vehicles, and drive them to an unknown destination.

108. On January 10, 2014, at approximately 8:14 a.m., GRAVES spoke with YOUNG about the plan to drive to Lompoc, California. During the intercepted call, they confirmed that they were leaving that afternoon. GRAVES then brought up the problem of how to get enough rental vehicles to transport the 5,000 pounds of drugs. YOUNG suggested that they get two rental cars. GRAVEs said, "that's too many cars nigga . . . let me do the thinking, God Dammit."

109. Agents maintained surveillance on the group for approximately 48 hours from the evening of Friday, January 10, 2014 until Sunday, January 12, 2014. On Friday morning, agents observed GRAVES and SHELTON drive north together in a car that GRAVES rented for the trip with YOUNG following in YOUNG's car. They stayed at a hotel in Lompoc, California, about 15 minutes from the beach.

SALGADO-VISCARRA arrived several hours later, at around 3:00 a.m. the next morning.

110. On Saturday, January 11, 2014, SALGADO-VISCARRA traveled to Surf Beach in Lompoc, California, and then returned to the hotel. The group remained at the hotel through Saturday night but never went out. On Sunday January 12, 2014, the group returned to San Diego.

111. On January 15, 2014, agents discovered an abandoned boat that had been run aground on a remote beach approximately one hour north of Lompoc, California. The boat contained approximately 4,400 pounds of marijuana. A navigational chart found in the boat indicated that the boat was destined for Surf Beach, in Lompoc, California.

**On January 16, 2014, Defendants GRAVES, SHELTON, and SALGADO-VISCARRA, aided by LAGRONE, agreed to pick up 330 kilograms of marijuana, the remnant of the 5,000 pounds brought by boat, in San Bernardino, California**

112. On January 16, 2014, at approximately 9:04 p.m., SALGADO-VISCARRA called GRAVES and confirmed that the approximately 3,000 pounds of marijuana in the boat that ran aground earlier that day was their load. During the intercepted call, SALGADO-VISCARRA said that it had arrived on January 14, 2014, at 11:00 p.m. and that "they" [SALGADO-VISCARRA and his helpers] were able to pick up "330" [330 kilograms of marijuana] but had to leave everything else on the beach.

GRAVES said that all "he" had to do was call the others to go pick up the marijuana. SALGADO-VISCARRA said that the "boss" was upset, but that he and GRAVES were not to blame. SALGADO-VISCARRA asked GRAVES to assist in picking up the 330 kilograms of marijuana taken from the boat, which was waiting in San Bernardino, California. GRAVES said he would look for a truck.

113. On January 16, 2014, at approximately 2:24 p.m., GRAVES called SHELTON. During the intercepted call, GRAVES asked SHELTON to join him in going to San Bernardino, California to pick up "300 of em" [300 kilograms of marijuana]. GRAVES and SHELTON then discussed how to get a vehicle to transport the marijuana, eventually settling on asking LAGRONE to rent a van.

114. Agents set up surveillance near a truck-rental company in El Cajon, California, and observed LAGRONE rent a large van, hand SHELTON the keys, and SHELTON drive the van out of the lot, with GRAVES leading in a separate vehicle.

115. Agents maintained visual surveillance of GRAVES and SHELTON from El Cajon, California, to San Bernardino, California, where GRAVES and SHELTON, stopped to eat at a fast food restaurant. Agents parked nearby.

116. While GRAVES was inside the restaurant, SHELTON walked around the parking lot. Agents noticed SHELTON pausing and looking at, and into, their vehicles at least twice. After GRAVES and SHELTON left the restaurant, they

conducted extensive counter-surveillance, making multiple circles around the block, making U-turns, parking in random locations and leaving their vehicles to look around. Agents attempted to follow while remaining undetected. GRAVES and SHELTON returned to San Diego without picking up the marijuana.

117. Intercepted calls between GRAVES and CASTRO-HERNANDEZ on January 16, 2014, confirmed that GRAVES and SHELTON abandoned the plan to pick up the 300 kilograms of marijuana because they thought they were under surveillance. GRAVES explained: "We get up there, we waiting right . . . not only do they got us in the mother fucking probably hottest part of . . . San Bernardino . . . police every mother fucking where, so we leave . . . thought we was been followed and everything, Gun [SHELTON] . . . did counter surveillance and all that shit . . . so we done do all that shit, drove all the way up there, came all the way back, and didn't even get the work [marijuana] it was supposed to have been like 300 [kilograms] of em, didn't even get the shit."

**On January 15, 2014, Defendant GRAVES and Defendant YOUNG discussed over the phone ways to promote their respective prostitution businesses**

118. On January 15, 2014, at approximately 9:01 a.m., GRAVES and YOUNG had a lengthy discussion about managing their prostitutes. During the intercepted call, GRAVES described CASTRO-HERNANDEZ and YOUNG referenced a

woman named "Melissa." GRAVES said, "you gotta hustle your ho." By insisting that his prostitute produce, GRAVES said, "Monday night, she [CASTRO-HERNANDEZ] had like 4-5 calls." GRAVES then said, "when you getting 3-4 calls its going to be bite, and once you get a bite you might keep getting nibbles, but you gotta be on top of it." GRAVES and YOUNG then discussed their overhead, and concluded that with hotel costs and service fees from listing agencies, they had overhead costs of approximately 40% of their prostitutes' gross earnings.[9]

**On February 4, 2014, Defendant GRAVES agreed to sell Defendant WHITTLE narcotics**

119. On February 4, 2014, GRAVES agreed to sell WHITTLE narcotics. During an intercepted call, GRAVES asked WHITTLE if he wanted "the same thing? What? A ball? [1/8 ounce of narcotics] Q? [quarter ounce of narcotics] What?" WHITTLE said "yeah."

---

9 Several intercepted phone calls show that CASTRO-HERNANDEZ worked as a prostitute in various locations. For example, on March 7, 2013, at approximately 11:48 a.m., CASTRO-HERNANDEZ told GRAVES that the maids were hanging out in the halls of her hotel. CASTRO-HERNANDEZ then told GRAVES that she did not want to leave the hotel because she had already paid for the room. GRAVES said that he would go to the hotel and look around. On March 14, 2014, at approximately 11:23 p.m., GRAVES told YOUNG that CASTRO-HERNADEZ had earned $1,400 that day, that she would probably work the casino the next day, and that she would be going to Las Vegas, Nevada the following week and returning with about "2-3 racks" [$2,000-$3,000]. On March 20, 2014, at approximately 8:29 p.m., CASTRO-HERNANDEZ told GRAVES that she was going out on an "out call" [prostitution] at a name-brand hotel in La Jolla, California. CASTRO-HERNANDEZ then told GRAVES that before going out she would search the internet for any sting operations.

**On February 6, 2014, Defendant GRAVES received narcotics at Target Location #1**

120. On February 6, 2014, at approximately 9:45 a.m., GRAVES received a call from a supplier of narcotics. During the intercepted call, the supplier told GRAVES that he had narcotics, "some good ones," to sell to GRAVES. GRAVES asked the supplier to bring them over so he could see them. The supplier confirmed. A short time after that call, agents observed GRAVES meeting with two individuals at **Target Location #1**. Subsequent intercepted calls indicated that GRAVES had received marijuana at that time, and that the supplier would provide GRAVES with methamphetamine and cocaine.

**Beginning at an unknown date and continuing up to and including at least February 7, 2014, Defendant GRAVES supplied Defendant WHITTLE with multiple quantities of narcotics, including "quarters" [1/4 ounce of narcotics] and "balls" [1/8 ounce of narcotics]**

121. On February 7, 2014, at approximately 8:20 p.m., GRAVES spoke to WHITTLE about narcotics. During the intercepted call, GRAVES criticized WHITTLE for slowing down his "hustle" [drug distribution business]. GRAVES said that WHITTLE used to call him for "quarters" [1/4 ounce of narcotics] and now he does "balls" [1/8 of an ounce of narcotics]. GRAVES said he remembered when WHITTLE would do nothing but quarters. WHITTLE agreed to work harder.

**On February 7, 2014, Defendant GRAVES told Defendant HOLLINS that Paris Hill's cooperation with law enforcement was a "violation" of WCC rules that had to be "dealt with" and GRAVES authorized HOLLINS to murder Paris Hill**

122. As described above, on October 25, 2013, WCC member Jeffrey "JJ" Rees was killed in the parking lot of a fast-food restaurant in San Diego, California, during an assault and robbery involving several WCC gang members. Seven WCC gang members were charged with murder in the California Superior Court for the County of San Diego.

123. Paris Hill, aka "Binkie," was one of the gang members present during the attack in October 2013. Hill gave a statement to officers regarding the incident. Documents indicating that Hill provided that statement were released in January 2014.

124. On February 7, 2014, at approximately 10:39 a.m., GRAVES received the following intercepted text message from phone number (619) 384-3278: "Big bro this ur young 20s . . . caby . . . aye I been hitin u frm this 9922658." ["Big bro" is a sign of respect from a younger gang member to a senior gang member. The "young 20s" are a sub-set of the WCC of gang members. Caby is HOLLINS' gang moniker.]

125. At approximately 11:56 a.m., HOLLINS (having identified himself in the text message earlier that morning) called GRAVES from (619) 384-3278. During the intercepted call, HOLLINS said he needed to meet with GRAVES and that it was

urgent, a "9-1-1." GRAVES agreed to meet HOLLINS.

126. At approximately 2:49 p.m., GRAVES called CASTRO-HERNANDEZ and described his meeting with HOLLINS, his "young general." During the intercepted call, GRAVES told CASTRO-HERNANDEZ that HOLLINS was seeking advice and wanted to run something by him. GRAVES said that HOLLINS told him about a young gang member who was a snitch. GRAVES said it was crazy, "niggas is facing life sentences and everything man. These niggas, they don't think muthafucka know, this nigga don't think a muthafucka know he done did this shit." CASTRO-HERNANDEZ asked if they had "paperwork." GRAVES affirmed and said, "somebody say he thinking he [Hill] might be still working" [serving as a confidential informant]. GRAVES told CASTRO-HERNANDEZ that he told HOLLINS: "I don't object . . . whatever you all feel you all need to do . . . handle it . . . its not like, not an order . . . [it is] in violation and violations get dealt with. Period. No ifs, ands, or buts." CASTRO-HERNANDEZ said, "this shit aint no game."

127. In the days following that February 7, 2013, call, agents identified the person at issue in GRAVES' conversation with HOLLINS as Paris Hill.

128. On February 22, 2013, at approximately 7:20 p.m., LAGRONE spoke with GRAVES about the 3-Babiez clique. During the intercepted call, GRAVES

referenced HOLLINS and said HOLLINS was getting stressed and was losing his mind. (In context, HOLLINS was worried over what he planned to do to Paris Hill.) GRAVES further said that he was with the "knock off the snitches [movement] . . . if mother fuckers been telling, they gotta go, I don't give a fuck if its [KS] or whoever the fuck with the rest of them niggas that's supposed to be on paperwork [government documents showing cooperation], so they gotta go, period." GRAVES went on, "once you go out the back door, you are no good, you are out of here."

**On February 12, 2014, GRAVES sold FRANKLIN 3/4 of an ounce of crack cocaine and FRANKLIN attempted to intimidate the arresting officers by identifying himself as a "Crip."**

129. On February 12, 2014, in a series of intercepted text messages starting at approximately 11:02 a.m., FRANKLIN requested a "half" and a "7" [21 grams or 3/4 of an ounce of narcotics] from GRAVES. Following those communications, agents saw FRANKLIN meet with GRAVES.

130. After FRANKLIN met with GRAVES, local police officers initiated a traffic stop on FRANKLIN's vehicle for a broken tail light. FRANKLIN told officers that he possessed marijuana and he consented to a pat down search. Officers observed a tattoo on FRANKLIN saying that he killed police officers. As officers were conducting a pat down, FRANKLIN struggled with officers and he kicked officers, inflicting a minor injury. Officers took FRANKLIN down to the ground and finished

the pat down, finding a bag containing 3/4 of an ounce of crack cocaine in his underwear (the exact amount ordered from GRAVES). As the officers found the crack cocaine, FRANKLIN said "fuck you, get the fuck off of me." FRANKLIN also announced that he was "Crip."

**On February 13, 2014, Defendant GRAVES sold Defendant HARRISON 2.99 grams of crack cocaine**

131. On February 13, 2014, at approximately 12:27 p.m., HARRISON sent an intercepted text message to GRAVES saying: "Need gitWitCha bigg2win$,, hollabacc Cuzzo." GRAVES and HARRISON then exchange a series of intercepted text messages eventually agreeing to meet at a nearby restaurant.

132. At approximately 1:44 p.m., GRAVES called HARRISON to explain that he was late for their meeting. During the intercepted call, HARRISON turned the conversation to their upcoming meeting and said, "I'm already in the hole a dub but that's gonna make it 4 huh?"

133. At approximately 2:00 p.m., GRAVES met HARRISON. After their meeting, local police officers pulled over HARRISON's car for failing to stop at a stop sign. During the stop, officers asked HARRISON for consent to search both HARRISON and his car. HARRISON gave consent. Officers then searched HARRISON's car and found marijuana. Officers then searched HARRISON's person and noticed that his buttocks were tense and clenched together. An officer

pulled HARRISON's underwear away from his body and saw a plastic bag protruding from HARRISON's anal cavity. Officers removed the plastic bag and, inside of the bag, found a substance that appeared to be crack cocaine and weighed approximately 2.99 grams. HARRISON provided a statement admitting to his knowledge of the crack cocaine and stating that he received it the night before from a female named "Trisha."

**On February 13, 2014, Defendants GRAVES and LAGRONE agreed to distribute crack cocaine**

134. On February 13, 2014, at approximately 2:07 p.m., GRAVES and LAGRONE discussed a supply of narcotics which LAGRONE was to give to her customer. During the intercepted call, GRAVES told LAGRONE to give her customer "the biggest little piece and that will be a ball [1/8 ounce], give her that for the three." LAGRONE agreed.

**On February 18, 2013, Defendants GRAVES and LAGRONE distributed crack cocaine**

135. On February 18, 2013, agents intercepted additional calls in which GRAVES and LAGRONE discussed selling crack cocaine to a customer. Agents set up surveillance and saw GRAVES meet LAGRONE. Agents then followed LAGRONE and saw her meet with a customer. Agents followed the customer to an apartment and searched the residence based on the customer's probation status.

Agents found 0.22 grams of crack cocaine among the customer's possessions. Another person in the room was also using crack cocaine when agents entered. LAGRONE's customer admitted to possessing the crack cocaine and to selling it to the other person in the room. The .22 grams that agents found were the remainder from that recent sale.

**On February 28, 2014, Defendant GRAVES sold 5 grams of cocaine to Defendant YOUNG**

136. On February 28, 2014, at approximately 12:12 p.m., YOUNG asked to meet with GRAVES. During the intercepted call, GRAVES asked "you want the 3-2, right?" YOUNG answered, "yeah." In a follow up call, at approximately 1:07 p.m., GRAVES clarified, "you wanted 2 soft and 3 soft, all soft [cocaine], right . . . 2 and 3 right?" YOUNG confirmed, "yeah."

137. Shortly after the last call, GRAVES met YOUNG. Following that meeting, local police officers stopped YOUNG's car for speeding. YOUNG pulled over and consented to a search. Officers searched YOUNG and his car, but were unable to find any cocaine.

138. After YOUNG was pulled over, at approximately 2:09 p.m., GRAVES called CASTRO-HERNANDEZ. During the intercepted call, GRAVES said he was watching YOUNG get searched. GRAVES then said, "Good thing all soft [powder cocaine and not crack cocaine]. Bad thing he got a conviction for it . . . It was two

separate baggies . . . It ain't nothing but a couple of grams so he can say it was just for him to party with." GRAVES complained to CASTRO-HERNANDEZ that the police were knocking off his "soldiers."

139. At approximately 3:14 p.m., GRAVES spoke to CASTRO-HERNANDEZ again. During the intercepted call, GRAVES said that his business was "crackin" that day and that he had already done four calls.

140. At approximately 4:08 p.m., GRAVES sent CASTRO-HERNANDEZ an intercepted text message saying: "Thy [officers] let em [YOUNG] go. Didnt find it [cocaine]." CASTRO-HERNANDEZ replied: "Man gud shit less fo u baby."

**On or about February 2014, Defendant BUTLER informed Defendant GRAVES that he had seen "paperwork" [documentation of Hill's cooperation with the prosecution] on Paris Hill**

141. On March 5, 2014, at approximately 1:03 p.m., GRAVES spoke to YOUNG about Hill's cooperation with authorities. During the intercepted call, GRAVES told YOUNG that on a prior occasion GRAVES had learned that BUTLER had seen "paperwork" on Hill. (BUTLER was in jail at that time.) GRAVES indicated that BUTLER's statement was sufficient to regard Hill as a cooperator.

**On March 1, 2014, Defendants HOLLINS and GRAVES participated in the murder of Paris Hill**

142. Paris Hill was shot in the head early in the morning of March 1, 2014, in front of a night club, **Target Location #5**. Officers received a call regarding a body

on the street at the corner of 47th street and Federal Boulevard, very close to the club, at approximately 6:00 a.m. on March 1, 2014. Preliminary analysis indicated that the cause of death was a single gunshot to the head, likely from a .45 caliber firearm.

143. JACKSON owns the night club where Hill's body was found. There was a birthday party at the club on February 28, 2014, for another WCC gang member. Several OGs were present at the party, including GRAVES. JACKSON was in Chicago at the time and learned about the shooting from a WCC member who worked at the club as a security guard, who spoke to JACKSON the next morning.

144. On March 1, 2014, at approximately 9:29 a.m., the club's security guard called JACKSON. During the intercepted call, the security guard told JACKSON that another OG member needed to "chastise" somebody.

145. On March 1, 2014, at approximately 11:34 p.m., JACKSON spoke to the host of the party the previous night. During the intercepted call, the host told JACKSON that he saw approximately three "youngsters" that evening, and he mentioned "Little DC" [BANDY]; "Trey-O" [COOK]; and "Caby" [HOLLINS] who were speaking to "Sweets" [GRAVES]. JACKSON said that the security guard told him that the OG wanted to " discipline" somebody.

146. Officers' interviews with witnesses on March 1 and 2, 2014, confirmed that HOLLINS appeared at an apartment where Hill was staying late in the evening of

February 28, 2014, and insisted that Hill accompany him. Hill later appeared on surveillance video from a liquor store close to the night club accompanied by HOLLINS. That surveillance video is the last time Hill was seen alive.

147. A security guard at a factory across the street from the club and a truck driver parked nearby (waiting to make a delivery) described hearing a loud "pop" at approximately 2:15 p.m. The guard and the truck driver thought a tire had popped and did not call police. The truck driver saw a grey sedan leaving the area soon after he heard the "pop." Security video from across the street shows the grey sedan leaving the scene at 2:16 a.m.

148. HOLLINS' girlfriend owns a vehicle consistent with the vehicle seen leaving the club at 2:16 a.m. Video from HOLLINS' girlfriend's apartment complex shows that same vehicle arriving at 2:21 a.m. The video from the apartment complex further shows a person consistent with HOLLINS' height and build, wearing a hooded sweatshirt, exit the vehicle. Immediately after, a second vehicle arrived and two men wearing hooded sweatshirts, consistent with the height, build, and ethnicity of COOK and BANDY, exit the vehicle. The video captures a partial frame of a person's hair style which appears to be COOK. It is a five minute drive from the club to the apartment complex.

149. On March 1, 2014, at approximately 9:29 p.m., GRAVES discussed Hill's

murder with CASTRO-HERNANDEZ. During the intercepted call, GRAVES told CASTRO-HERNANDEZ his thoughts regarding several WCC members who were upset about Hill's murder. GRAVES had recently delivered narcotics to FRANKLIN, a close friend to Hill, and FRANKLIN was crying over Hill's death. GRAVES explained: "[t]hey don't feel that niggers got all the paperwork [documents showing cooperation] and they [are] mad because they said them niggers moved only on him because of cuz word and all this." GRAVES said that if you are a gang member and you see "paperwork" on somebody you need to "handle your business." GRAVES went on to explain what he meant:

> If you got reputable niggers that [are] in place to see this and they said it's a foul ball and it's a green light [gang authorization to kill someone] or blue light [the Crip translation for a "green light"] . . . should a mother fucker wait until after he go through the damage and testify on a mother fucker and give a mother fucker a life sentence or some more shit or should a mother fucker handle the business and prevent a mother fucker from doing it [by killing the cooperating witness.]
>
> . . . .
>
> Niggers, this is your job . . . that's why shit be happening and shit get loose because some of these niggers don't want to get up and do what they supposed to be doing when they supposed to do it. They getting lazy . . . Nigger when duty calls, nigger sometimes you got to step aside cuz you might save a life nigger. . . .

**On March 3, 2014, Defendants GRAVES and COOK agreed to tell a witness to Paris Hill's murder to "watch his fucking mouth"**

150. On March 3, 2014, at approximately 11:13 a.m., GRAVES sent COOK an

intercepted text message saying: "Wes Holla 411 911." GRAVES called COOK a minute later. During the intercepted call, GRAVES and COOK discussed a young gang member who was present at the party, got drunk, and took his shirt off wanting to start a fight. GRAVES said he was concerned because that young gang member left his shirt at the scene and the police took it and were running the shirt for DNA. GRAVES thought that the police might be able to identify that person's DNA, and the person who owned the shirt might talk to the police. GRAVES instructed COOK to tell that person to "watch his fucking mouth." COOK responded, "ok, for sure, I'm going to deal with it right now." GRAVES added, "Aight, everything else covered but yeah cover that one. Get up on that one immediately." GRAVES told COOK to "keep me posted."

**On March 3, 2014, Defendant GRAVES ordered Defendants COOK and BANDY to "do the bitch" [murder a witness]**

151. HOLLINS was arrested the evening of March 3, 2014.

152. On March 4, 2014, GRAVES and COOK spoke over the phone about something that needed urgent attention. During the intercepted call, COOK informed GRAVES that HOLLINS had been arrested the day before, and officers had searched HOLLINS' house. When COOK told GRAVES that narcotics had been seized during the search, GRAVES responded, "that's it?" COOK further explained that HOLLINS' bail had been revoked (from his pending robbery case) and that officers

wanted to talk to COOK and "the other two little homies." When COOK began to go on, GRAVES cut him off and suggested they meet in person. GRAVES and COOK arranged to meet later that day.

153. Agents followed GRAVES to a meeting with COOK and watched the meeting over a pole camera previously installed in front of the residence of another WCC member, William Wash (charged elsewhere).

154. Subsequent intercepted calls indicate that at that March 4, 2014, meeting, GRAVES ordered COOK to murder DF ("do the bitch") so that DF would not testify against HOLLINS. Specifically, on March 13, 2014, GRAVES told RODRIGUEZ:

> I swear to God, you can ask that nigga Trey-O [COOK] what I told em, I said nigga we'll have to do the bitch . . . I told em . . . yeah she gotta go, she shared too much from jump . . . she already said who she was with, she already admitted that they picked him up . . . the bitch probably told them the whole plot.

155. GRAVES clarified his intent, stating that if it were up to him, he would have tied up DF and the next time anyone saw her she would be in a "body bag." GRAVES told RODRIGUEZ that it was now "too late."

156. On March 4, 2014, at approximately 10:50 p.m., GRAVES spoke to BANDY about his meeting with COOK. During the intercepted call, GRAVES asked BANDY if BANDY had spoken with COOK and knew what GRAVES had said. BANDY confirmed that COOK had communicated GRAVES' order.

GRAVES ordered BANDY to: "get on that as soon as possible." BANDY agreed.

157. Immediately following HOLLINS' arrest on March 3, 3014, officers placed DF in protective custody.

**On March 4, 2014, Defendant GRAVES ordered Defendant BANDY to obstruct the investigation into the Paris Hill murder**

158. Following GRAVES' meeting with COOK on March 4, 2014, GRAVES called BANDY. During the intercepted call, BANDY told GRAVES that "they" [officers] were trying to interview him. BANDY said that he had nothing to say and did not know anything. GRAVES told BANDY to "stick to that." BANDY said he knew what to do because he was "raised by the best."

159. GRAVES then referenced the young gang member whom he had previously discussed with COOK, the one who left his shirt at the party. BANDY indicated he knew the person GRAVES had in mind. GRAVES asked BANDY if he had spoken to that person. BANDY said he had not yet been able to reach him but would "holler" at him when he found him. GRAVES reminded BANDY that "he," referring to the young male, did not know anyone at the party. BANDY affirmed.

**On March 13, 2014, Defendant GRAVES delivered narcotics to Defendants RODRIGUEZ and BANDY, for redistribution**

160. On March 13, 2014, RODRIGUEZ called GRAVES to request narcotics. During the intercepted call, RODRIGUEZ asked GRAVES to get her "work"

[narcotics]. GRAVES confirmed that he could provide RODRIGUEZ with narcotics.

161. In a subsequent intercepted call, GRAVES told RODRIGUEZ that he needed to drop off drugs to FRANKLIN first, and asked RODRIGUEZ to meet him at a fast-food restaurant down the street from where RODRIGUEZ had been staying with BANDY.

162. Later that same evening on March 13, 2013, BANDY requested narcotics from GRAVES. During the intercepted call, BANDY said, "I think we might get a gram of that." GRAVES asked, "soft?" [powder cocaine]. BANDY said, "yeah." Following the call, agents saw GRAVES and BANDY meet for approximately 20 minutes. At the end of the meeting, agents saw GRAVES hand BANDY a small object.

**On March 13, 2014, Defendants RODRIGUEZ and GRAVES discussed how to prevent DF from cooperating with the investigation into the Paris Hill murder**

163. As noted above, HOLLINS was arrested on March 3, 2014, following Paris Hill's murder on March 1, 2013. HOLLINS had a bond hearing on March 13, 2013. Agents observed RODRIGUEZ at that hearing. HOLLINS was not granted bail. At that time, DF, HOLLINS' girlfriend, was already in protective custody.

164. On March 13, 2013, RODRIGUEZ and GRAVES spoke on the phone regarding HOLLINS' bail hearing. During the intercepted call, they expressed

concern that "his girl" [DF] was cooperating with law enforcement. RODRIGUEZ told GRAVES that "they" [RODRIGUEZ, BANDY, and other gang members who were living together at the time] had been looking for DF and could not find her.

165. During the call, GRAVES grew agitated that they could not locate DF and said he had previously warned them that this would happen. GRAVES then referenced his prior conversation with COOK on March 4, 2014, stating that they needed to "do [kill] the bitch [KS]," as described in detail above.

166. GRAVES finished with a call to action: "now it's the time to go all out . . . that bitch is in the program and everything [witness protection] that means she telling, that's why he's [HOLLINS] in there [jail]." GRAVES told RODRIGUEZ that they needed to "clean up the mess" and explained that since DF had moved and was out of reach they needed to start "taking all the witnesses away." GRAVES continued:

> [W]e run across any of them [witnesses] we knocken [kill] 'em down . . . the bitch [DF] don't shut up, mother fuckers keep dying, we lose 2-3 homies, 2-3 mother fuckers in your family [DF's family members] got to go [get killed] . . . nobody spared, you run your mouth you die, period, you run and hide we get the next closest thing to you, period, no ifs ands or buts . . . now it's time to step up.

**Defendant GRAVES earned substantial profits from his drug business which he used to promote his drug business and the WCC enterprise**

167. Based on approximately six months of wire intercepts and many hours of

surveillance, agents have determined that GRAVES has not had a job during this investigation.

168. In an intercepted call on February 11, 2014, GRAVES told YOUNG that he earned "a couple hundred thousand" [$200,000] a year from his drug business, and that he expected CASTRO-HERNANDEZ to earn at least $100,000, "half" of what he, GRAVES, earned.

169. Agents identified two bank accounts owned and controlled by GRAVES and CASTRO-HERNANDEZ and have received records from one of those accounts. Analysis of those records indicates that, between May 2012 and January 2014, deposits totaled $121,525.94. Almost all of those deposits were made in states other than California and cash deposits are the only source of funds for this account. Most of the deposits were withdrawn, as the average daily balance for most of this time was a few thousand dollars.

170. On February 6, 2014, GRAVES spoke to an individual about the difficulties of depositing money through a particular bank. During the intercepted call, the individual told GRAVES that they could no longer exchange money through the bank they had been using because the bank required identification and would not allow him to keep depositing money into an account in another person's name.

171. Finally, during an intercepted call, GRAVES told CASTRO-HERNANDEZ

that he purchased his Mercedes-Benz with money that he made doing business with SALGADO-VISCARRA.

## TARGET SUBJECTS – SUMMARY OF PROBABLE CAUSE

172. Based upon the facts and circumstances set forth above, and as supplemented in the lettered paragraphs which follow, I submit that there is probable cause to believe that the Target Subjects knowingly and intentionally participated in the RICO conspiracy alleged in the attached complaint, a violation of Title 18, United States Code, Section 1962(d). Following a brief summary of each Target Subject's involvement in the Enterprise, I list the paragraphs in this affidavit substantiating that involvement, beginning with defendant Randy Alton GRAVES.

a. Randy GRAVES is a documented OG of the WCC. GRAVES receives wholesale-quantities of narcotics from SALGADO-VISCARRA, JACKSON, and others and distributes those narcotics to gang members in San Diego and other states. In the summer and fall of 2013, GRAVES sold distributable quantities of methamphetamine to a CI. Since October 25, 2013, GRAVES has discussed at least one narcotics transaction almost every single day, with exceptions only for a handful of days when GRAVES was too ill to leave his house, and an approximately three week period in January and February, 2014, when agents were not monitoring GRAVES' phone.

GRAVES and SALGADO-VISCARRA orchestrated a scheme to import 5,000 pounds of marijuana into the United States by boat in January 2014, and GRAVES purchased 2 kilograms of cocaine from SALGADO-VISCARRA in November 2014. GRAVES received a box containing approximately $28,000 in cash for one of those kilograms of cocaine and agents seized a kilogram of cocaine which GRAVES put in the U.S. mail. GRAVES is also a pimp to CASTRO-HERNANDEZ and has had extensive conversations regarding CASTRO-HERNANDEZ' prostitution activities. GRAVES is an OG or shot caller within the WCC and in that role he provides advice and direction to younger gang members. HOLLINS consulted with GRAVES before the Paris Hill murder and GRAVES directed the actions of COOK, BANDY, and RODRIGUEZ to cover-up the Paris Hill murder. [See paragraphs throughout affidavit.]

b. Darnell BUTLER is a documented WCC member, an important sub-distributor of narcotics for GRAVES, and a trusted confidant to GRAVES. BUTLER discussed his narcotics business with GRAVES and received narcotics from GRAVES. BUTLER also received a firearm from GRAVES, which BUTLER threw from his car window during a high-speed flight from police. BUTLER provided GRAVES with confirmation that Paris Hill was

cooperating with law enforcement against ROSS, and GRAVES relied on BUTLER's word to authorize HOLLINS to murder Paris Hill. BUTLER maintained ties with younger gang members, such as HOLLINS, and COOK. [See ¶¶ 49, 63.a., 63.b., 63.d., 66, 69, 73-74, 84, 95.a., 96, 97, 98, 99, 141.]

c. Dameon SHELTON is a senior-level gang member who operated a mail-order narcotics business with GRAVES. SHELTON was a partner to GRAVES on a transaction in which agents seized one kilogram of cocaine sent to an out-of-state customer through the mail. SHELTON drove up to Lompoc, California, with GRAVES in January 2014 to help unload 5,000 pounds of marijuana from a boat. SHELTON and GRAVES had extensive discussion about gang business, including the WCC's efforts to kill KS. [See ¶¶ 63.c., 71, 77-80, 87.b., 87.c., 87.f., 92, 99, 103, 106, 107, 109, 113-17.]

d. Leon FRANKLIN is an influential member of the WCC, a known member of the violent WCC 3-Babiez sub-set, received cocaine from GRAVES almost daily, and re-distributed it to various WCC gang members who re-sold it in San Diego. FRANKLIN was arrested with 21 grams of cocaine immediately after ordering 21 grams of cocaine from GRAVES. During his arrest, FRANKLIN fought with officers and threatened officers with his status as a WCC member. [See ¶¶ 64, 67-68, 70, 88, 129-30, 149,

161.]

e. Brandon WHITTLE is a frequent sub-distributor of narcotics for GRAVES and received narcotics from GRAVES on a regular basis from October 2013 through March 2014. [See ¶¶ 75, 100, 119, 121.]

f. Andre HARRISON is a frequent sub-distributor of narcotics for GRAVES and received narcotics from GRAVES on a regular basis from October 2013 through March 2014. When HARRISON thought GRAVES had shorted him on a delivery of narcotics in December 2013, GRAVES told HARRISON that the bag contained 3 grams of cocaine, "like always." In February 2014, HARRISON was stopped after ordering narcotics from GRAVES, and police found a bag containing 3 grams of cocaine wedged between HARRISON's buttocks. [See ¶¶ 65, 101-02, 131-33.]

g. Cleotha YOUNG is a "hommie" or trusted WCC member and a sub-distributor of narcotics from GRAVES and a pimp. Along with GRAVES and SHELTON, YOUNG travelled to Lompoc, California in January 2014, to help unload 5,000 pounds of marijuana from a boat. YOUNG is also a pimp and has had extensive conversations with GRAVES on how to promote his pimping business and exploit the prostitutes he maintains. YOUNG is also a frequent customer of narcotics from GRAVES. [See ¶¶ 103, 107, 109, 118,

136-38, 140, 141, 168.]

h. Sharod JACKSON is an OG or senior-level gang member who supplied GRAVES and SHELTON with marijuana in November and December 2013, which GRAVES and SHELTON shipped to other customers. JACKSON also owns the night club at which Paris Hill was murdered. JACKSON's employee provided him with information about the Paris Hill murder. [See ¶¶ 76, 78-80, 143-45.]

i. Terry HOLLINS is a member of the violent WCC/3-Babiez clique. HOLLINS admitted his participation in the murder of a Mexican gang member, believed to be Andres Caldera, to a CI. Soon after Caldera was murdered, HOLLINS, ROSS, and FOREMAN robbed a San Diego business at gunpoint. The gun recovered from the robbery was the same gun that was used to kill Caldera. Lab results show that HOLLINS contributed to the predominant DNA profiles found on a cigarette butt left at the scene of Meashal Fairly's murder on April 6, 2013. In November 2013, HOLLINS and other 3-Babiez members posed for a picture at the scene of Chyrene Borgen's murder soon after the murder. In February 2014, HOLLINS sought GRAVES' advice on what to do after he found out Paris Hill was cooperating. GRAVES told HOLLINS, "handle your business." HOLLINS was seen with Paris Hill

on a liquor store surveillance video shortly before Hill was murdered. Following Hill's murder, GRAVES told RODRIGUEZ that HOLLINS' girlfriend had to be killed because she knew "the whole plot." [See ¶¶ 23-30, 32-33, 36, 42-43, 45, 63.a., 63.b., 63.e., 88-99, 124-28, 145-46, 148, 151-52, 154, 157, 163-64, 166.]

j. Jermaine COOK is a member of the violent WCC/3-Babiez clique. Lab results show that COOK contributed to the predominant DNA profiles found on a cigarette butt left at the scene of Meashal Fairly's murder on April 6, 2013. On October 26, 2013, COOK and FOREMAN both left fingerprints in a stolen car that was shooting at another car while racing through downtown San Diego. COOK's fingerprint was on the passenger-side inner frame of the front door. In November 2013, COOK and other 3-Babiez members posed for a picture at the scene of Chyrene Borgen's murder soon after the murder. COOK acknowledged to GRAVES his presence at the scene of the Paris Hill murder on March 1, 2014. COOK agreed to tell another witness to the murder to "keep his mouth shut." In an attempt to cover-up the Paris Hill murder, GRAVES told COOK to "do the bitch" [murder HOLLINS' girlfriend]. COOK then passed on GRAVES' order to BANDY. [See ¶¶ 42, 60, 63.e, 145, 148, 150, 152-54, 156, 158-59, 165.]

k. Donald BANDY is a member of the violent WCC/3-Babiez clique. BANDY was present at the scene of the Paris Hill murder and agreed to assist GRAVES in covering up the murder. BANDY told GRAVES that, through COOK, he, BANDY, had received GRAVES' order to kill DF because of what she saw at the Paris Hill murder. BANDY purchased drugs from GRAVES on numerous occasions between March 3, 2014 and April 10, 2014. [See ¶¶ 145, 148, 156, 158-59, 161-62, 164.]

l. Marcus FOREMAN is a member of the violent WCC/3-Babiez clique. FOREMAN's cellular phone used a tower in the vicinity of the Andres Caldera murder, at the approximate time of the Andres Caldera murder. Witnesses identified FOREMAN, ROSS, and HOLLINS as carrying out an armed robbery of a San Diego business in December 2006. The gun used in the robbery had FOREMAN's DNA on it and was the same gun used to kill Andres Caldera a few days earlier. FOREMAN possessed methamphetamine packaged for distribution in January 2013. In October 2013, FOREMAN's fingerprint was found on the rearview mirror of a stolen car that chased and shot at another car in downtown San Diego. COOK's fingerprint was found on the front door frame of that stolen car. In November 2013, HOLLINS and other 3-Babiez members posed for a picture at the scene of Chyrene Borgen's

murder soon after the murder. [See ¶¶ 22, 24-25, 28, 30-31, 34, 36-39, 60, 63.d., 63.e., 88, 99.]

m. Wilbert ROSS is a member of the violent WCC/3-Babiez clique. Along with FOREMAN and HOLLINS, ROSS carried out an armed robbery of a San Diego business in December 2013. In April 2013, ROSS' GPS ankle bracelet was within a few feet of Meashal Fairley's murder, at the approximate time of the murder. In October 2013, ROSS forced a minor female to prostitute herself. Also in October 2013, ROSS orchestrated a robbery and assault in which Jeffrey "JJ" Reese was killed. In November 2013, ROSS and other 3-Babiez members posed for a picture at the scene of Chyrene Borgen's murder soon after the murder. In February, 2013, GRAVES approved HOLLINS murder of Paris Hill because Hill was testifying against ROSS. [See ¶¶ 23-25, 28, 30, 35-36, 43-44, 52-54, 63.e., 99.]

n. Brenda RODRIGUEZ is a WCC gang member and is close to the violent 3-Babiez WCC clique. RODRIGUEZ helped GRAVES discover that DF was in protective custody, prompting GRAVES to order RODRIGUEZ and BANDY to murder DF and DF's family members. Since March 3, 2014, RODRIGUEZ purchased distributable quantities of narcotics from GRAVES on several occasions. [See ¶¶ 154-55, 160-61, 163-64, 166.]

o. Gaquayla LAGRONE is a close confidant and sub-distributor of narcotics for GRAVES. LAGRONE has received narcotics from GRAVES on a regular, often daily, basis since as early as October 2013. LAGRONE assisted GRAVES' efforts to distribute 600 pounds of marijuana by renting a van for GRAVES and SHELTON. [See ¶¶ 63, 63.a., 71, 113-14, 128, 134-35.]

p. Solcamire CASTRO-HERNANDEZ is a female prostitute who works for GRAVES. CASTRO has assisted GRAVES' in distributing narcotics and obtaining firearms. CASTRO was observed mailing large boxes of drugs for GRAVES and retaining documents related to those shipments at her residence. GRAVES consulted with CASTRO on his decision to approve the Paris Hill murder by HOLLINS. [See ¶¶ 72-74, 89-92, 105, 117-18, 126, 138-40, 149, 168-69, 171, fn.7, fn.8, fn.9.]

q. Luis SALGADO-VISCARRA is a source of supply of cocaine and marijuana for GRAVES. SALGADO-VISCARRA supplied GRAVES with a kilogram of cocaine in November, 2013, which agents seized. SALGADO-VISCARRA invited GRAVES to assist in unloading and transporting 5,000 pounds of marijuana in January, 2014. SALGADO-VISCARRA provided GRAVES with cocaine on numerous occasions between November 2013, and April 2014. GRAVES boasted to CASTRO that the drugs that SALGADO-

VISCARRA provided allowed him to purchase a Mercedes sedan. [See ¶¶ 81, 83, 103-05, 107, 109, 110, 112, 171, fn.8.]

## SEARCH LOCATION SUMMARY

173. The locations for which I am requesting search warrants are described in full below.

a. **Target Location #1** (655 Sandalwood Drive, El Cajon, California, 92021) is the residence of Randy GRAVES. According to records obtained from San Diego Gas and Electric ("SDG&E"), the utilities at **Target Location #1** are subscribed to GRAVES' wife.[10] Agents have observed GRAVES at this location on numerous occasions since October 2013. On December 6, 2013, GRAVES retrieved a firearm from **Target Location #1** and provided that firearm to BUTLER. On November 13, 2013, GRAVES told SALGADO-VISCARRA that he would meet him at "the office" to negotiate a drug deal, and they then went to **Target Location #1**. GRAVES used **Target Location #1** to meet with SHELTON and YOUNG to plan their trip to Lompoc, California to pick up 5,000 pounds of marijuana in January 2014. On February 6, 2014, agents saw GRAVES receive marijuana from two individuals and take it into **Target Location #1**. Those same individuals told GRAVES that they

10 Numerous intercepted calls indicate that GRAVES' wife resides in a nursing home and not in **Target Location #1**.

could also supply methamphetamine and cocaine. Agents have intercepted several hundred calls over approximately six months where customers have ordered drugs from GRAVES. On numerous occasions, GRAVES told various drug customers that he keeps on his person and vehicle only enough narcotics to fill specific orders for a particular delivery. However, despite thousands of calls over approximately six months, GRAVES has not told customers that he could not fill an order. Therefore, I believe that GRAVES keeps additional narcotics supplies at **Target Location #1**. GRAVES has supplied narcotics to customers as recently as April 11, 2014.

b. **Target Location #2** (8087 Shady Sands Road, San Diego, California, 92119) is the residence of Solcamire CASTRO-HERNANDEZ. According to records obtained from SDG&E, the utilities at **Target Location #2** are subscribed to CASTRO-HERNANDEZ. As reference throughout the affidavit, GRAVES spoke to CASTRO-HERNANDEZ on numerous intercepted calls regarding the racketeering activity. Among other things, CASTRO-HERNANDEZ used **Target Location #2** to store documents used by GRAVES to send narcotics to customers in other states. After CASTRO-HERNANDEZ successfully sent the packages of drugs for GRAVES on December 3, 2013, GRAVES told her not to lose the two receipts. Subsequent

communications between GRAVES and SHELTON indicate that CASTRO-HERNANDEZ kept the documents at **Target Location #2**. When SHELTON sent GRAVES a text message asking when the packages would arrive, GRAVES texted back, "Dnt know da mami bitch [CASTRO-HERNANDEZ] got paper [has the package receipts with the tracking numbers]. Let U knw later." SHELTON asked GRAVES the status of the packages again the next day and GRAVES said he "didn't make it back over there to where the bitch at [**Target Location #2**] she got the slip over there though." Later that day, GRAVES texted SHELTON the tracking number. When GRAVES sent that text message his cell phone used the same cell phone tower that it used on numerous occasions when GRAVES, on the call, indicated that he was at **Target Location #2**. Intercepted phone calls show that CASTRO-HERNANDEZ worked as a prostitute in San Diego hotels, and also traveled out of state to work as a prostitute. In an intercepted call on February 9, 2014, GRAVES told YOUNG that he got CASTRO-HERNANDEZ "the pad" [**Target Location #2**] and that he was the lease holder. Further, agents have seen CASTRO-HERNANDEZ and a car registered to her at **Target Location #2** on numerous occasions, including as recent as April 2014.

//

c. **Target Location #3** (515 13th Street #213, San Diego, California, 92154) is the residence of Leon FRANKLIN. Records maintained by the California Department of Motor Vehicles ("DMV") show that FRANKLIN listed **Target Location #3** as his home address. In addition, agents have intercepted hundreds of calls and text messages in which FRANKLIN ordered narcotics from GRAVES. For example, on February 12, 2014, agents seized 21 grams of cocaine from FRANKLIN immediately after FRANKLIN ordered 21 grams of cocaine from GRAVES and was observed meeting with GRAVES. On April 9, 2014, FRANKLIN sent GRAVES a text message saying: "Wat up its stone [FRANKLIN's moniker] I need 2 7s different bags." FRANKLIN then sent GRAVES additional text message, stating, "OK I'm at the house?" and "No car she at work." GRAVES agreed to go to FRANKLIN's house. Agents then observed FRANKLIN and GRAVES conduct a hand-to-hand transaction in front of **Target Location #3**. After that meeting, agents observed FRANKLIN go back into the building where **Target Location #3** is located. Interviews with neighbors after that meeting confirm that FRANKLIN resides at **Target Location #3**.

d. **Target Location #4** (811 S. 32nd Street, San Diego, California, 92113) is the residence of Sharod JACKSON. Records maintained by the

DMV show that JACKSON listed **Target Location #4** as his home address. In addition, SDG&E records obtained for **Target Location #4** list JACKSON's wife as a roommate. Furthermore, when GRAVES planned to meet with JACKSON on February 7, 2014, GRAVES parked in front of **Target Location #4**. Later intercepted calls confirmed that GRAVES and JACKSON met. On February 20, 2014, agents observed JACKSON at **Target Location #4** throughout the day.

e. **Target Location #5** (4582 Federal Avenue and 4584 Federal Boulevard, San Diego, California, 92105) is a business owned by Sharod JACKSON. According to records obtained from SDG&E, the utilities at **Target Location #5** are subscribed to "Sharod Levaile" [JACKSON's first and middle name]. In addition, SDG&E records list the headquarters address as 4584 Federal Boulevard. Further, on November 13, 2013, GRAVES told SHELTON he was inspecting a product that JACKSON had for sale (with a text message saying: "Yea it look cool. 8 of em. Da other dnt lk 2 hot"). Toll records indicate that GRAVES' phone used the same cell phone tower for this communication as it used on March 1, 2014, the night Paris Hill was murdered, when GRAVES indicated he was leaving **Target Location #5**. In addition, Paris Hill was murdered in front of **Target Location #5**, during a WCC party

attended by several other WCC members who were inside **Target Location #5** when Hill was killed. On March 5, 2014, JACKSON's wife allowed detectives to walk through **Target Location #5** and told them that the business office was located upstairs. The upstairs-office is part of the same structure as 4582 Federal Boulevard but has a different address, 4584 Federal Boulevard.

f. **Target Location #6** (10767 Jamacha Boulevard #10, Spring Valley, California, 91978) is the residence of Luis SALGADO-VISCARRA. Records maintained by the DMV show that SALGADO-VISCARRA listed **Target Location #6** as his home address. In addition, SALGADO-VISCARRA has conducted numerous large-scale narcotics transactions with GRAVES, including brokering the sale of 2 kilograms of cocaine in November 2013 and 5,000 pounds of marijuana in January 2014. On April 19, 2014, agents observed GRAVES and SALGADO-VISCARRA meet at **Target Location #1** to discuss the examination of a sample of marijuana that was representative of a larger quantity that SALGADO-VISCARRA had for sale. After that meeting, agents followed SALGADO-VISCARRA back to **Target Location #6**. SALGADO-VISARRA was driving a vehicle registered to him at **Target Location #6**.

## ITEMS TO BE SEIZED

174. Based upon my experience and training, consultation with other law enforcement officers experienced in drug, gang, and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

175. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often maintain at their residence, residences of associates, place of business and/or rental storage locations quantities of controlled substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

176. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking often maintain at their residence, residences of associates, place of business and/or rental storage locations records and ledgers evidencing their trafficking activities in order to keep track of the manufacturing, ordering, purchasing, storage, distribution and transportation of drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators. These records are often maintained not only on paper, but also as computer data in

the form of computer hardware and software.[11]

177. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking must often rely on other to obtain drugs and to help them market the drugs and evidence of the identities of those criminal associates is often maintained at their residence, residences of associates, place of business and/or rental storage locations.

178. Based on prior searches of premises used by individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein. I also believe that I will find documents and/or photographs evidencing the association between various Target Subjects and other individuals associated with the Enterprise.

179. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers

---

11 Computer hardware and/or software (including electronic storage devices) seized pursuant to this warrant (to avoid the destruction of evidence) will be maintained in a secure location pending submission of a separate search warrant detailing the search protocol that will be sought for those items. In the event that search warrant(s) for those items are not issued, they will be returned within five days from the date of seizure.

conducting search warrants at the residence. Therefore, I am requesting permission to search all vehicles located on the premises associated with the respective Target Locations and their residents.

180. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking earn sums of money and often try to legitimize these profits. In order to do this them attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding the money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace. Records of these transactions are often found at their residence, residences of associates, place of business and/or rental storage locations.

181. Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the above-described

Target Locations. Intercepted conversations and seizures revealed that several of the Target Subjects have access and possession of firearms.

182. It is also my opinion and belief that the above-described documents are permanently possessed by drug dealers/manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug dealers/manufacturers whether or not the dealer/manufacturer is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the Target Locations to be searched despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

183. The investigation into the criminal activities of the above individuals reveals that their drug distribution and violent activities are ongoing. Due to the quantities of narcotics being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating.

184. Based on upon my experience and training, consultation with other law

enforcement officers experienced in drug, gang, and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment B, which evidence a violation of Title 18, United States Code, Section 1962(d), as set forth above, will be found at the above-noted locations.

**SEALING REQUEST**

185. Because of the ongoing nature of this investigation, I am requesting that this affidavit, the arrest warrants, criminal complaints, search warrants, seizure warrants, and all other associated court records be ordered sealed until further order of the court, as disclosure of any of the above would hamper further investigative efforts.

Katie Harding
Katie Harding, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 22 day of April, 2014.

Nita L. Stormes
HON. NITA L. STORMES
United States Magistrate Judge